[676 NYS2d 579]

Frank D. Seinfeld et al., Derivatively and on Behalf of American Express Co., Appellants, v James D. Robinson, III, et al., Respondents. William C. Rand, Shareholder Objector.

First Department, August 27, 1998

### APPEARANCES OF COUNSEL

*Robert L. Conason* of counsel (*Gair, Gair, Conason, Steigman & Mackauf; Abbey, Gardy & Squitieri, L. L. P; Wechsler Harwood Halebian & Feffer, L. L. P.; Goodkind Labaton Rudoff & Sucharow, L. L. P.; Chimicles, Jacobsen & Tikellis; Greenfield & Rifkin, L. L. P.; Levin, Fishbein, Sedran & Berman; Milberg Weiss Bershad Hynes & Lerach, L. L. P.;* and *Wolf, Haldenstein, Adler, Freeman & Herz, L. L. P.,* attorneys), for appellants.

*William C. Rand,* shareholder objector *pro se.*

### OPINION OF THE COURT

SAXE, J.

The issue that we are asked to resolve in the context of this appeal involves what results shareholders must achieve in a derivative action before they are entitled to receive an award of attorneys' fees.

Plaintiffs sued derivatively to challenge alleged misconduct on the part of certain corporate officers and directors of American Express Co. (Amex), and sought various relief, including money damages, an accounting and attorneys' fees. The underlying misconduct arose out of the relationship of Amex with Edmond J. Safra, one of the world's most influential bankers. In 1983, Amex purchased the Geneva-based Trade Development Bank (TDB), which was owned by Safra, and TDB was merged into Amex's international banking arm, American Express Bank, with Safra put in charge of the bank. In December 1984, as a result of conflicts of style and personality between Safra and James Robinson, Amex's Chairman and CEO, Safra resigned as Chairman of the bank, but agreed not to start a new bank for four years.

Based upon concerns that Safra's return to banking in 1988 would lead to his regaining former clients, causing the TDB-Amex Bank to founder, in late 1986, Susan Cantor was hired as an executive in Amex's public-relations department, and was assigned to research and investigate Safra's background and conduct in the hopes of finding evidence that could be used

by Amex to object to the issuance of a new Swiss banking license to Safra. In turn, Cantor contracted with one Tony Greco, a private detective with a criminal record.

In January 1988, Safra obtained a Swiss banking license and opened a new bank in Geneva, despite Amex's attempts to prevent it. Scandalous articles about Safra then began appearing in newspapers and magazines in several countries, charging that he was involved in drug trafficking, money laundering and the Iran-Contra scandal, and had ties to organized crime. It turned out that Greco and Cantor were planting these false stories, which came to light only after considerable expenditure of time and money by Safra.

Instead of proceeding with claims against Amex for this unconscionable conduct, in 1989 Safra settled for a public apology by Mr. Robinson on behalf of Amex, and Amex's agreement to donate to charities designated by Safra $8 million that was already earmarked for charitable contributions by Amex.

In mid-1989, Amex's board of directors asked its Audit and Public Responsibility Committee, composed of five nonmanagement directors, to investigate the Safra affair and report to the Board. The Audit Committee retained three prominent law firms and Arthur Young & Co. (now Ernst & Young) to aid its investigation. In its written report, the Audit Committee concluded that the Amex employees involved in the Safra matter did not intend to disseminate inaccurate information, but that their actions set off a chain of events that resulted in the maligning of Safra. The Audit Committee concluded that it was not in the best interests of Amex or its shareholders to initiate any litigation with respect to the Safra matter. The Board adopted the Audit Committee's report and recommendations in their entirety.

Nevertheless, eight Amex shareholders commenced derivative actions, which were all consolidated into the present action.

On May 17, 1996, the parties to these derivative actions agreed to settle the litigation, with the proviso that plaintiffs could apply to the court for an award of attorneys' fees and disbursements not to exceed $3.5 million. The stipulation contained two resolutions. Resolution I requires that Amex's general counsel must approve a contract to hire outside investigators (like Greco) if the cost is over $150,000, and the investigator must confirm that he or she has read and will follow Amex's "Code of Conduct". Resolution II provides that for four years Amex will not acquire more than 50% of any

investment-banking business unless it is approved by a majority of the outside directors.

Pursuant to Business Corporation Law § 626 (d), plaintiffs moved for court approval of the settlement and for an award of attorneys' fees to the plaintiffs. Section 626 (e) authorizes the award of attorneys' fees in a shareholders' derivative action "[i]f the action on behalf of the corporation was successful, in whole or in part, or if anything was received by the plaintiff or plaintiffs * * * as the result of a judgment, compromise or settlement of an action." Nevertheless, it is undisputed that the applicable standard for the recovery of attorneys' fees requires not only that "anything was received by the plaintiff," but that the plaintiffs achieved a "substantial benefit."

The motion court, although it otherwise approved the settlement, denied attorneys' fees, finding that no substantial benefit was achieved by this lawsuit. The only issue presented on this appeal is whether the benefit conferred on Amex by virtue of this shareholder derivative action was sufficiently "substantial" to warrant an award of attorneys' fees.

We begin by reviewing the development of the "substantial benefit rule," and examining the nature and extent of the benefits that have been held sufficient to justify awards of attorneys' fees.

The substantial benefit rule has arisen and been articulated primarily in a series of Federal cases. The rule is generally viewed as a judicial extension of the "common fund" doctrine. Established by the United States Supreme Court in *Trustees v Greenough* (105 US 527 [1881]), the common fund doctrine allows for an award of counsel fees out of a common fund actually created by a successful shareholder litigation. In this manner, while only a handful of shareholders may have initiated the lawsuit, the monetary benefit for all is paid for by all.

Citing *Greenough* and the "historic equity jurisdiction of the federal courts", in *Sprague v Ticonic Bank* (307 US 161, 164), the Court first allowed counsel fees where no common fund was created by the litigation. The petitioner in *Sprague* had funds deposited in trust with the respondent bank at the time the bank was dissolved. The determination of her action resolved as a matter of law the rights of 14 other depositors in the same predicament. In granting her request for attorneys' fees, the Court cited "the power of equity in doing justice as between a party and the beneficiaries of his litigation" (307 US, *supra,* at 167).

While the inception of the substantial benefit doctrine is traced to *Sprague,* that case merely made it clear that the cre-

ation of a common fund is no longer a prerequisite to an award of counsel fees. The case law considering what constitutes a substantial benefit has developed over the years.

In the leading case of *Mills v Electric Auto-Lite* (396 US 375), the United States Supreme Court further clarified the definition of the substantial benefit. In *Mills*, a group of minority shareholders brought a derivative action, successfully establishing that the proxy solicitation for an upcoming merger was materially misleading and in violation of section 14 (a) of the Securities Exchange Act of 1934 (48 US Stat 881, 895, as amended [codified at 15 USC § 78n (a)]). In granting the petitioners' request for counsel fees to be paid by the nominal respondent, Electric Auto-Lite Co., the Court held that the petitioners should be reimbursed for the costs of merely establishing the violation: "the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders * * * [R]egardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." (396 US, *supra,* at 396, quoting *Murphy v North Am. Light & Power Co.*, 33 F Supp 567, 570.)

*Mills* illustrates the proposition that a substantial benefit accruing to the corporation need not have a readily ascertainable monetary value. As the Third Circuit has noted, the Court "clearly extended the circumstances in which the award of attorney's fees is appropriate to situations where the 'suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid' " (*Kahan v Rosenstiel*, 424 F2d 161, 166, *cert denied sub nom. Glen Alden Corp. v Kahan*, 398 US 950). The nonpecuniary value of the benefit conferred is significant since the Court's theoretical aim was to avoid unjust enrichment: "To allow others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense. This suit presents such a situation. The dissemination of misleading proxy solicitations was a 'deceit practiced on the stockholders as a group,' * * * and the expenses of petitioners' lawsuit have been incurred for the benefit of the corporation and the other shareholders" (*Mills v Electric Auto-Lite, supra,* at 392, quoting *Case Co. v Borak*, 377 US 426, 432).

In *Schechtman v Wolfson* (244 F2d 537, 540), relied upon by the motion court here for its denial of attorneys' fees, the Second Circuit acknowledged that "[t]he modern equity practice is to allow counsel fees to successful prosecutors of derivative suits although no judgment has been obtained if they show substantial benefit to the corporation through their efforts * * *. Nor is it necessary that a cash fund be produced." In *Schechtman*, plaintiff shareholder brought suit under the Clayton Act to enjoin directors of the defendant corporation from serving simultaneously on a competitor corporation's board. Ultimately, the directors resigned from the competing directorship, rendering the action moot. In his request for counsel fees, plaintiff noted that the directors would, as a result of their actions, devote their energies solely to the defendant corporation. The court held that this was not a "substantial benefit", explaining that the director in question, Mr. Wolfson, could have chosen to work for either company (*supra,* at 540).

However, *Schechtman* preceded *Mills v Electric Auto-Lite* (*supra*) and represents a somewhat restrictive interpretation, not representative of the Second Circuit's later, broader rulings. Subsequent opinions of the Second Circuit reflect a broader view of the meaning of "substantial benefit" as set forth in *Mills*. For instance, in *Kopet v Esquire Realty Co.* (523 F2d 1005), plaintiff, a limited partner in a real estate venture, commenced a class action alleging violations of the Securities Exchange Act of 1933 for failure to file a registration statement and prospectus in connection with the refinancing of one of Esquire's properties. The District Court granted summary judgment in favor of the plaintiff, but denied his request for counsel fees (386 F Supp 1229). Comparing the benefit to that attained in *Mills*, the *Kopet* court reversed, holding, "it appears that appellant rendered a service to the partnership by vindicating the statutory policy against unregistered offerings. Esquire benefited from appellant's action both in arresting an existing violation of the law and in the deterrent effect which it may be assumed the action will have on the future conduct of Esquire management" (523 F2d, *supra,* at 1008). It also explained that "[t]here is no question * * * that federal courts may award counsel fees based on benefits resulting from litigation efforts even where adjudication on the merits is never reached, e.g., after a settlement" (*supra,* at 1008, citing *Blau v Rayette-Faberge, Inc.*, 389 F2d 469).

Similarly, in *Koppel v Wien* (743 F2d 129), the plaintiffs were limited partners of a real estate venture whose general

partners were soliciting approval of a modification of the original participation agreement that would allow the partners to retain more than their ratable share upon the sale of the property. Plaintiffs alleged misstatements and omissions in the solicitation, in violation of the Securities Exchange Act. Defendants withdrew the solicitation and thus rendered the action moot. The District Court denied the plaintiffs' request for attorneys' fees, finding no " '*clear benefit*' " obtained where the sale of the property was not imminent (*supra,* at 133). In reversing the District Court, the Second Circuit wrote, "it is irrelevant to plaintiffs' entitlement to attorney's fees that no sale of the property has yet been consummated and consequently that the amount of the benefit conferred may not be precisely ascertained. While the extent of the benefit may be relevant to the determination of the amount of fees properly chargeable, the right to a fee reward depends only on the existence of a benefit. Nor is it the case * * * that attorney's fees are not recoverable until participants actually receive a tangible benefit. The avoidance of contingent liabilities or the creation of contingent benefits triggers an immediate right to attorney's fees" (743 F2d, *supra,* at 133-134). The court was thus willing to award counsel fees based on the creation of a "contingent benefit." In fact, the *Koppel* court would have awarded attorneys' fees even if it were established that the property would never be sold: "Even if defendants had established the absence of a tangible monetary benefit, the non-monetary benefits resulting from plaintiffs' suit would fully justify a fee award. It is well established that non-monetary benefits, such as promoting fair and informed corporate suffrage [citation omitted], or deterring future misconduct by management [citation omitted], may support a fee award" (*Koppel v Wien, supra,* at 134-135, citing *Mills v Electric Auto-Lite, supra; Kopet v Esquire Realty Co., supra*).

While all parties agree that the applicable standard here is that of "substantial benefit," it is worth noting the existence of a significant number of cases where courts have termed the benefits of the derivative litigation before them to be "scant," "slight," "modest," or even "minimal," and have nevertheless granted attorneys' fees, albeit fees largely reduced from the sums demanded (*see, e.g., Whittemore v Sun Oil Co.,* 58 FRD 624; *Lewis v Anderson,* 81 FRD 436; *United Operating Co. v Karnes,* 482 F Supp 1029; *Weissman v Alliance Capital Mgt. Corp.,* 650 F Supp 101). This suggests the courts' overriding concern with equitable considerations, rather than a strict adherence to the definition of the word "substantial."

Here, the resolution at issue provides that no outside investigator shall be hired by Amex at a cost of $150,000 or more per engagement "unless the procedures set forth in this Resolution are met." Among other things, these procedures require the company and outside investigators to enter into a written contract, to be approved by the company's general counsel, and require Amex to preserve records of all contracts with and payments to outside investigators, including all related expense vouchers. It is designed to prevent the retention of outside investigators in the behind-the-scenes manner in which Greco was retained.

Certainly, the "chain of events" to which the Audit Committee referred could not have unfolded as it did had the procedures contained in the stipulation been in effect in 1984. Essentially, the resolution now ensures that an ill-conceived plan like that which led to Amex's most embarrassing public apology in 1988 could not be so secretly undertaken. As Ted J. Fiflis, Professor of Law at the University of Colorado Law School, asserted in support of the application, the resolution will work to "eliminate clandestine activities of questionable legality such as the Safra actions."

The motion court viewed this benefit as of little value since a "reoccurrence [of the Safra matter] is unlikely" (172 Misc 2d 159, 166). We disagree. Although in general such occurrences are unlikely, given that such misconduct actually occurred, it is neither gratuitous nor futile for concerned shareholders to establish a policy specifically tailored to stifle it, and it is not inequitable to require the corporation, rather than a few shareholders, to pay for this benefit.

These benefits are precisely the type of "corporate therapeutics" the Supreme Court deemed a substantial benefit in *Mills v Electric Auto-Lite* (*supra,* at 396). The clandestine chain of events that culminated in public embarrassment for Amex and its shareholders can fairly be considered a "deceit practiced on the stockholders as a group" (*Case Co. v Borak*, 377 US, *supra,* 432). As such, in implementing procedures that will prevent the exact sequence of events from reoccurring, plaintiffs have furnished a benefit to all shareholders.

In finding that no substantial benefit was achieved here, the motion court cited *Mokhiber v Cohn* (608 F Supp 616, 628, *affd* 783 F2d 26), for the proposition that the adoption of purely "cosmetic" or "ephemeral" changes does not warrant an award of attorneys' fees (172 Misc 2d, *supra,* at 166). However, the *Mokhiber* court referred to lesser benefits than those achieved

here. In *Mokhiber*, certain shareholders of the Ford Motor Company brought a derivative action in which they alleged that Henry Ford, II, the chairman of the company's board of directors, had wrongfully used company funds to pay for his luxurious lifestyle. As a result of their efforts, the corporation's board of directors appointed a disinterested special audit committee to review the alleged wrongdoings of Mr. Ford, and the audit committee "caused the Company to circulate four directives which restated, clarified or modified regulations" concerning the company aircraft, automobiles and other "personal services" (*supra* at 620). While these directives were insignificant and changed little or nothing, but merely reinforced or restated a pre-existing policy, the stipulation entered into with Amex accomplished much more, in that the corporation adopted procedures not previously in place, which could have prevented the debacle that occurred.

The motion court also quoted *Weissman v Alliance Capital Mgt. Corp.* (650 F Supp 101, 104, *supra*) for the proposition that there is no " 'reason thus to reward and encourage litigation which is settled to produce such scant benefit for the shareholders.' " (172 Misc 2d, *supra,* at 170.) However, although the court characterized the benefit obtained by the plaintiff in *Weissman (supra,* at 104) as a "slight and gradual scaling down" of an advisory fee, representing a reduction of only .025% of the investment advisors' fee at issue there, the *Weissman* court did not deny plaintiff's counsel fee request in its entirety. Rather, the court merely held that "no upward adjustment of [the] lodestar figure [counsel fees of $59,699.50 and expenses of $7,500] would be appropriate because the benefits achieved were slight at best" (*supra,* at 103). Thus in declining to "reward" and "encourage" the plaintiff in that case, the *Weissman* court (*supra,* at 104) was referring to fees above and beyond the lodestar figure.

The motion court relied on *Brown v Stackler* (612 F2d 1057) in stating, "assuming arguendo that the resolutions provide some benefit, that the fee request is excessive militates against awarding any fee." (172 Misc 2d, *supra,* at 170.) However, reliance on *Brown v Stackler* in support of a complete denial of fees is misplaced. *Brown (supra,* at 1059) involved a fee request that was "obviously inflated to an intolerable degree." In *Brown,* counsel's fee request claimed over 800 billable hours on what the court viewed as a "plain and simple" case that was to be disposed of according to the outcome of a case pending in another State court; moreover, the research had been done by students on a volunteer basis (612 F2d, *supra,* at 1059). Here, in contrast, the motion court did not question the careful calculation that went into the plaintiffs' counsel fee request. In fact, in a footnote, the court stated: "[n]othing in this decision detracts from the eminence of Counsel, the court's esteem for

them, *or the accuracy of their reported hours expended on these matters*" (172 Misc 2d, *supra,* at 170, n 5; emphasis added).

Finally, the motion court cited *United Operating Co. v Karnes*(482 F Supp 1029, *supra),* where despite the discontinuation of the derivative action, an award of attorneys' fees was based upon the benefit received by the corporation in that new auditing procedures were developed to control the making of illegal discounts in the future. The *Karnes* court conceded that the benefit was not very substantial, stating, "[i]ndeed, the major benefit to the company is the termination of this expensive and time-consuming litigation" (*supra,* at 1031). Nonetheless, the court felt compelled by policy considerations to award some compensation: "The basic dilemma faced by the Court is that, if it disallows a fee application in situations such as this, plaintiff's counsel in the future will be compelled to continue litigation, rather than abandon all hope of a fee. Consequently, the Court believes that plaintiff's counsel should receive some fee, but nothing approaching that requested" (*supra,* at 1032). The *Karnes* court, presented with a fee request for $125,000, awarded counsel $40,503.18. The benefit conferred in *Karnes* is analogous to the resolutions adopted in this case.

The issue of whether and to what extent to award attorneys' fees in such circumstances "is an issue addressed to the discretion of the Court in the exercise of its equitable powers" (*United Operating Co. v Karnes,* 482 F Supp 1029, 1031, *supra,* citing *Levin v Mississippi Riv. Corp.,* 377 F Supp 926, 931, *affd* 508 F2d 836, *cert denied sub nom. Gabriel v Levin,* 421 US 915). The results achieved by the plaintiffs here were sufficient to warrant an award of attorneys' fees. The issue of the appropriate amount to award is remanded to the motion court. Reasonable disbursements, if proven, should be awarded.

Accordingly, the order of the Supreme Court, New York County (Stephen Crane, J.), entered on or about February 21, 1997, which, insofar as appealed from, denied plaintiffs' application for attorneys' fees and disbursements in this stockholders' derivative action, should be reversed, on the law, the facts, and in the exercise of discretion, without costs, and plaintiffs' application for attorneys' fees remanded to the Supreme Court, New York County, for further proceedings.

LERNER, P. J., ELLERIN and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered on or about February 21, 1997, reversed, on the law, the facts and in the exercise of discretion, without costs, and plaintiffs' application for attorneys' fees remanded to the Supreme Court, New York County, for further proceedings.