Nathan KAPLAN, Plaintiff–Appellee,

Edith Citron, Martin H. Philip, derivatively on behalf of Texaco, Inc. Consolidated–Plaintiffs–Appellees,

Texaco, Inc., Defendant–Appellee,

v.

William C. RAND, Esq., Appellant,

Robert A. Beck, Peter I. Bijur, John Brademas, Willard C. Butcher, Edmund M. Carpenter, Alfred C. Decrane, Jr., Michael C. Hawley, Franklyn G. Jenifer, Allen J. Krowe, Thomas S. Murphy, Charles H. Price, II, Robin B. Smith, William C. Steere, Jr., Thomas A. Vanderslice, William Wrigley, Robert Ulrich, J. David Keough and Richard A. Lundwall, Defendants.

Docket No. 98–9377

United States Court of Appeals, Second Circuit.

Argued: May 24, 1999

Decided: Sept. 14, 1999

David J. Bershad, Milberg Weiss Bershad Hynes & Lerach LLP, New York, N.Y. (Sanford P. Dumain, Joan T. Brown, U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, of counsel), for Consolidated–Plaintiffs–Appellees.

(Milton J. Schubin, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY, Harvey R. Miller, Stephen A. Radin, Weil, Gotshal & Manges LLP, New York, NY, of counsel) for Defendants and Defendant–Appellee.

William C. Rand, Esq., New York, NY, pro se.

Before: KEARSE, MINER and McLAUGHLIN, Circuit Judges,

MINER, Circuit Judge:

Appellant–Objector William C. Rand, Esq. appeals from a judgment entered in the United States District Court for the Southern District of New York (Brieant, J.) awarding to counsel for plaintiffs-appellees Nathan Kaplan, Edith Citron and Martin H. Philip $1 million for legal fees and disbursements in connection with services rendered in a stockholders' derivative action. Kaplan, Citron and Philip, stockholders of Texaco, Inc., brought this action on behalf of Texaco against the various officers, directors and employees of the corporation named as defendants in the caption. In their consolidated amended complaint, they sought various forms of relief against the defendants for breach of fiduciary duties and contractual obligations. Over stockholder objections, the district court ultimately approved a proposed Stipulation of Settlement that required Texaco to make certain reports available to stockholders and to insert a non-discrimination statement in its vendor contracts. The settlement afforded the

plaintiff stockholders no relief of any kind against the defendant officers and employees.

The district court deemed the settlement fair and reasonable, found that counsel for the plaintiffs had conferred a benefit upon the corporation, and referred to a Special Master for hearing and report the application of plaintiffs' counsel for fees and disbursements for services rendered in the prosecution and settlement of the derivative action. The report of the Special Master recommended an award of $1 million, computed by applying a multiplier to the lodestar figure and adding expenses. Several stockholders, including Rand, who is an attorney, filed objections to that report. However, the district court adopted the report *in toto* and entered judgment accordingly. Rand, although not a party, appeals only the award of counsel fees. For the reasons that follow, we reject the contention of counsel for the stockholders that we lack jurisdiction to consider this appeal on account of Rand's non-party status and reverse the judgment of the district court with directions for the entry of judgment denying any award to counsel.

## BACKGROUND

The foundation for the action giving rise to this appeal was laid in an earlier action in the district court entitled *Roberts v. Texaco, Inc.* The individual plaintiffs in the earlier case sued on behalf of themselves and a putative plaintiff class, alleging in their complaint that Texaco had engaged in a pattern and practice of discrimination against them in violation of the Civil Rights Act of 1871, 42 U.S.C. § 1981, and the New York Human Rights Law, N.Y. Exec. Law § 296. Thereafter, a first amended complaint was filed to add claims on behalf of other individual plaintiffs. It included allegations that all of the plaintiffs, as well as the putative class, were disadvantaged by Texaco's violations of Title VII of the Civil Rights Law of 1964, 42 U.S.C. §§ 2000e *et seq.* The amended complaint accused Texaco of violating the rights of its African–American salaried employees by engaging in prohibited conduct that had a disparate impact upon them. According to the amended complaint, this conduct consisted of discrimination in compensation, promotion and other terms and conditions of employment, including training and job assignments.

Following various proceedings in the course of the litigation, *see Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 189–191 (S.D.N.Y.1997), the parties on November 15, 1996 entered into an Agreement in Principle for settlement of the action. Concluding, after a fairness hearing, that the settlement was beneficial to the class, the district court approved the agreement by order dated March 21, 1997.

The approved settlement had several components. First, Texaco created a $115 million settlement fund to pay (i) monetary claims arising out the settlement, (ii) costs, including reasonable attorneys' fees for plaintiffs' counsel, experts, and consultants, (iii) costs associated with administration of the settlement, (iv) other obligations that Texaco might have in connection with the settlement, and (v) the expenses of any other court ordered remediation. The settlement provided that Texaco would not object to the payment of reasonable attorneys' fees and expenses to be approved by the district court. Second, Texaco agreed to increase the annual base salary of each plaintiff-employee by 11.34%. Third, Texaco formed and funded the Task Force on Equality and Fairness (the "Task Force") which, during its five-year term, was charged with "initiating and determining the effectiveness of improvements and additions to Texaco's human resources programs and helping to monitor the progress made in such programs toward creating opportunity for African–Americans, diversity in the Texaco workforce and equal opportunity for all Texaco employees." *Id.* at 192.

The district court would oversee the Task Force by monitoring biannual reports by the Task Force to Texaco's Chairman and its Board of Directors and an annual report by the Task Force to the court. These reports were to detail the "impact of the settlement." *Id.* Any objections by Texaco to the determinations of the Task Force would be resolved by the district court. Pursuant to the settlement, Texaco also agreed to fund reasonable compensation of the staff, consultants, statisticians and other experts of the Task Force.

The district court had referred for review the application of plaintiffs' counsel for legal fees and expenses and the application of the individual plaintiffs for incentive awards to a Special Master. By order dated September 11, 1997, the district court adopted the Report of the Special Master and authorized payment in accordance with the Report. *Id.* at 189.

On November 6, 1996, two years after the commencement of the *Roberts* action and less than two weeks before the execution of the Agreement in Principle approved by the district court, plaintiff-appellee Nathan Kaplan initiated the derivative action that was later consolidated with another derivative action brought by plaintiffs-appellees Edith Citron and Martin H. Philip. It is the award of counsel fees following the settlement of that consolidated action that we examine here. The consolidated amended complaint invoked the diversity jurisdiction of the district court and included the following allegations:

> Plaintiffs bring this action derivatively in the right of and for the benefit of Texaco to redress injuries suffered and to be suffered by the Company as a direct result of the violations of law and breaches of fiduciary duty, corporate mismanagement, waste of corporate assets, and abuse of control by the Individual Defendants.
>
> . . . .

This action is brought to remedy violations of applicable state common law, fiduciary duty and contractual obligations.

In the consolidated complaint, the individual defendants were charged with responsibility for the illegal discriminatory employment practices of Texaco and therefore with the financial losses and other detriments sustained by the corporation as a result of those practices. The *Roberts* settlement was reviewed in some detail in the amended complaint, and it was alleged that the settlement in that case resulted in a cost to Texaco of some $176.1 million dollars, all brought about as the result of the wrongful acts of the officers, directors and employees named as defendants. The complaint listed additional losses in the following allegation:

> Despite the settlement in the *Roberts* Action, Defendants' wrongdoing has caused and will cause Texaco to be subjected to substantial negative and detrimental publicity; the alienation of past, present and potential employees, customers and other persons and entities with whom it does business; the potential loss of substantial revenues and earnings; the loss of hundreds of millions of dollars in market capitalization; the payment of a large settlement award; the possible imposition of criminal and civil fines, penalties and court sanctions; the incurrence of millions of dollars of legal fees and expenses; and other costs and damages.

The relief sought against the defendants was comprehensive:

> WHEREFORE, plaintiffs request judgment as follows:
>
> A. declaring that the directors and officers and employees named as Individual Defendants herein have committed breaches of trust and have breached their fiduciary duties and contractual obligations as alleged herein;
>
> B. against the Individual Defendants, jointly and severally, requiring them to pay to Texaco the amounts by

which it has been damaged or will be damaged by reason of the conduct complained of herein;

C. requiring the Individual Defendants to remit to the Company all of their salaries and other compensation received for the periods when they breached their duties;

D. ordering that the Individual Defendants and those under their supervision and control refrain from any further such unlawful activities as are alleged herein and implement corrective measures, including a system of internal controls and procedures sufficient to prevent the repetition of the acts complained of herein, which will rectify all such wrongs as have been committed and prevent their recurrence;

E. awarding plaintiffs reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

F. granting such other and further relief as this Court may deem just and proper.

Following the oral argument of motions to dismiss the complaint on various grounds, the attorneys for the parties commenced settlement discussions. An agreement in principle for settlement was reached on September 26, 1997, and the district court thereafter denied the pending motions to dismiss without prejudice and with leave to renew if the settlement was not consummated. A proposed Stipulation of Settlement was filed on December 31, 1997, and the parties agreed to submit it for court review as soon as practicable. Other than six pages relating to releases of all concerned in the litigation from every known and unknown claim (except claims by and against Texaco with respect to three individual defendants who were not past or present directors of the corporation), the Stipulation contains only the two following substantive provisions:

a. A statement will be included in Texaco's Annual Report to shareholders for the year 1997 stating that sharehold-ers may receive a copy of the public portion of the Equality and Fairness Task Force's Annual Report to the Court, prepared pursuant to the Settlement of the *Roberts* Action, by writing to, sending an e-mail to, or calling a toll-free number at, Texaco and requesting a copy. This obligation will continue for so long as the Task Force remains in existence. Any portion of the Task Force's report that is not made public by the Task Force or that is sealed by the Court need not be provided to shareholders.

b. The following "Statement of Equality and Tolerance Objectives" will be made a part of all new contracts entered into by Texaco with outside vendors:

> Texaco, Inc. is affirmatively committed to the fullest extent to an environment of inclusion; to eradicate all forms of prejudice within the company; to promote and foster complete equality of job opportunities within the company to all applicants and employees regardless of race, gender, religion, age, national origin and disability; and to ensure tolerance, respect and dignity for all people.

Texaco will take reasonable steps to enforce the principles set forth in this Statement. The affirmative commitment in this Paragraph shall not apply to existing contracts, and shall not apply in any jurisdiction if and to the extent that it is or becomes inconsistent with any law of that jurisdiction. Any failure by Texaco to act in accordance with this obligation will not give rise to any cause of action or third party beneficiary right in favor of any person or entity other than Texaco.

According to the Stipulation, counsel for plaintiffs would seek fees and expenses not to exceed $1.4 million in the event of approval of the Settlement by the district

court, and "[d]efendants will not oppose this application."

The district court approved the settlement by Memorandum and Order dated April 15, 1998. The approval followed a settlement hearing held pursuant to notice duly given and was issued over stockholder objections to the settlement as well as to the award of counsel fees. Finding that the settlement terms were "essentially institutional," the court concluded "that the non-pecuniary so-called therapeutic benefits to the corporation" formed a sufficient basis for settlement of the derivative claims. Accordingly, the settlement was designated "fair and reasonable." The court observed that "it is obvious that the settlement, which brings no monetary benefit to the company, is far less than was envisioned." Nevertheless, the court recognized that there were certain obstacles to plaintiffs' original claims and ultimately determined the plaintiffs "to be prevailing parties and to have conferred a benefit on the corporation."

As to the issue of attorneys' fees, the court entered an Order on April 23, 1998 appointing a Special Master. According to the docket entry of April 23, 1998, the Special Master was to "inquir[e] into the application for legal fees pending in the above entitled litigation, to take the arguments and proofs and otherwise consider the matter and report as to a reasonable fee to be awarded under the totality of the circumstances found to be present in the case." The Special Master sent a notice of hearing to all counsel and objectors and received oral and written submissions both supporting and opposing a fee award. The Special Master filed his Report on July 6, 1998.

In his Report, the Special Master noted that the law firms representing plaintiffs were seeking a total of approximately $1.4 million dollars. *See In re Texaco, Inc. Shareholder Litig.,* 20 F.Supp.2d 577, 587 (S.D.N.Y.1998) (appending report of Special Master). This sum was computed by applying a multiplier of 2.15 to the total

hourly charges and adding expenses of approximately $34,000. In support of this application, counsel for plaintiffs cited the litigation risks, the contingent nature of the fees, the quality of the opposition and the benefit achieved. The objectors variously contended that the settlement provided no more than a minimal additional benefit to the benefits achieved in the *Roberts* action, that the total fees claimed were excessive, and that the hours billed were exaggerated. *See id.* at 588. Counsel for Texaco, in accordance with the Settlement Agreement, raised no opposition to the fee requested. The Special Master observed that Texaco's counsel did provide a post-hearing submission responding to the objectors' contention that, despite the fact that any attorneys' fees awarded would be paid by Texaco's directors' and officers' liability insurer, the corporation ultimately would pay in the form of increased future insurance premiums. The response was that the insurance policy subsequently had been renewed without an increase in premiums. *Id.*

Following a discussion of the need to establish a substantial benefit to the corporation as a condition precedent to the award of attorneys' fees in a stockholders' derivative action, and of the nature of the benefit here as simply therapeutic, the Special Master turned to the rules governing the computation of fees. After reviewing the lodestar method of computation (hours reasonably expended times reasonable hourly rate), the Special Master determined that the hours and rates put forward by plaintiffs' counsel were reasonable in all respects, "considering the issues and challenges presented and the vigor with which skilled and highly experienced plaintiffs' counsel proceeded and equally skilled and experienced defense counsel pressed an aggressive defense strategy." *Id.* at 591.

In connection with the application of counsel to apply a 2.15 multiplier to the lodestar calculation, the Special Master noted that the use of a multiplier has been

subject to stringent requirements in cases where no common fund has been created. With respect to counsel's argument in favor of the enhancement on the basis of litigation risks, contingent nature of the fee, quality of opposition and benefit achieved, the Special Master recognized the countervailing arguments of the objectors that there was no monetary benefit to the corporation and that both the lodestar and the enhancement should be reduced or disallowed altogether for lack of success. Observing that a risk of success multiplier is "problematic" in this circuit, and that there is no "decision precisely on point in the context of an equitable fund/substantial benefit case," the Special Master nevertheless found a multiplier justified by the "quantum of benefit" provided by the settlement. *Id.* at 593–94. The Special Master concluded that the benefit was "substantial for the stockholders, but not enough to justify the fee enhancement requested." *Id.* at 595. In recommending an aggregate fee of $1 million, representing total fees and expenses to be allowed, the Special Master granted what he described as "a multiplier on the order of 1.5 (as contrasted with a requested total award of $1.4 million based on a multiplier of 2.15)." *Id.* at 596.

By Memorandum and Order filed on September 15, 1998, the district court approved the Report of the Special Master in all respects, rejecting various objections to the Report filed by certain shareholders as well as by plaintiffs' counsel. With respect to one shareholder's objection, the district court rejected the contention that the wide availability of the Annual Report of the Task Force on the Internet detracted from the advantage gained by making that Report available on request by telephone or correspondence. *See id.* at 579. In further justification of the fee, the court rejected the contention that nothing was gained by the vendor non-discrimination contract clause by noting that counsel for Texaco opined that failure to police the clause could give rise to (another) stockholders' derivative action. *See id.* at 579–80.

The district court next addressed objections by plaintiffs' counsel to the reduction of their requested fee. The district court did not accept the contention that the settlement came at no cost to Texaco because there was no increase in the directors' and officers' insurance premiums. *See id.* at 581. The court observed (a) that counsel improperly relied upon "the unfounded assumption that Texaco's insurance premiums would not have been reduced absent this lawsuit" and (b) that insurance payments generate "an economic and social cost, imposed upon and spread across the entire economy." *Id.* In any event, the district court found that plaintiffs "prevailed" by securing wide access to the Task Force Report and by causing the placing and policing of the anti-discrimination clause in Texaco's vendor contracts. *Id.* Under the circumstances, the district court deemed the lodestar fee and its enhancement, as recommended by the Special Master, "entirely reasonable." *Id.*

## DISCUSSION

### I. *Appellate Jurisdiction.*

■ Plaintiffs argue that we are without jurisdiction to consider this appeal because appellant William C. Rand, Esq. was not a party to the action in the district court and never moved to intervene there.[1] However, Rand properly filed objections to the proposed allowance of attorneys' fees in accordance with the notice given as required by the district court, and we are guided by circuit precedent in holding that such an objector in a stockholders' derivative action has standing to prosecute an appeal. We have long adhered to the principle that "if not a party, the putative

---

1. Rand made a belated motion to intervene at oral argument, having given notice of his intent to do so in his reply brief. For the reasons that follow, we find it unnecessary to rule on his application.

appellant is not concluded by [a judgment], and is not therefore aggrieved by it. But if the decree affects his interests, he is often allowed to appeal." *West v. Radio–Keith–Orpheum Corp.*, 70 F.2d 621, 624 (2d Cir.1934) (L. Hand, J.). To put it another way:

> Although the general rule is that only a party of record may appeal a judgment, a nonparty may appeal "when the nonparty has an interest that is affected by the trial court's judgment."

*United States v. International Bhd. of Teamsters*, 931 F.2d 177, 183–84 (2d Cir. 1991) (quoting *Hispanic Soc'y v. New York City Police Dep't*, 806 F.2d 1147, 1152 (2d Cir.1986)). The question therefore is whether the putative appellant can identify an "affected interest."

We think that a shareholder who objects to the payment of a fee from corporate funds in compensation of attorneys who have brought a derivative action on behalf of the corporation has an interest that is affected by the judgment directing payment of the fee. The interests of all stockholders in the financial well-being of the corporation are affected, and a stockholder who takes the time and trouble to respond to the court's notice of settlement has not sat on his right to voice and pursue his objections. Accordingly, there is no need for the stockholder to intervene formally in the action or to be a party to it in order to have standing to appeal. Such a rule is justified by the adversarial process through which the fairness of the settlement of a derivative action, including the fairness of fees to be paid to plaintiffs' counsel, is tested. Federal Rule of Civil Procedure 23.1 requires that "[t]he action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs." It would make little sense to invite a shareholder to file objections in the manner provided by Rule 23.1 and then deny him the right to challenge the district court's ruling on his objection.

It is no secret that in "seeking court approval of their settlement proposal, plaintiffs' attorneys' and defendants' interests coalesce and mutual interest may result in mutual indulgence." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir.1993); *see also* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum.L.Rev. 669, 714–720 (1986). Because a district court may overlook a "mutual indulgence," appellate review advances the policy of assuring the fairness to shareholders that underlies the requirement of court approval. Although there is a split in circuit authority, the rule we adopt today is in accordance with the views expressed in two leading treatises on federal practice. *See* 10 Federal Procedure § 25:184 (Law.Coop.1994) ("a nonparty shareholder who appears, pursuant to an FRCP 23.1 notice, to present objections to a proposed dismissal or settlement of a derivative action may appeal an adverse decision without having been formally made a party to the action, although no such appeal may be taken by a shareholder who has failed to make such an appearance"); 7C Charles A. Wright, et al., Federal Practice and Procedure § 1839 (2d ed.1986). While the plaintiffs' attorneys urge us to adopt specifically the no-intervention, no-standing rule of the Seventh Circuit, *see Felzen v. Andreas*, 134 F.3d 873 (7th Cir.1998), *aff'd sub nom California Pub. Employees' Retirement Sys. v. Felzen*, 525 U.S. 315, 119 S.Ct. 720, 142 L.Ed.2d 766 (1999) (per curiam) (4–4 decision), we decline to do so.

The *Felzen* opinion relied in large part on *Marino v. Ortiz*, 484 U.S. 301, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (per curiam). In *Marino*, the Supreme Court reviewed our decision in *Hispanic Society*, an employment discrimination case in which an examination for Sergeant in the New York

City Police Department was challenged as having a disparate impact on blacks and Hispanics. Following the entry of a consent judgment settling the case, 350 nonparty police officers filed a Notice of Appeal. In dismissing that appeal, we took note of our "affected interest" rule, but found as follows:

> In this case, appellants were not on the original eligible list, they have no right to promotion under state law, and they do not allege that the examination discriminated against them. Even if the settlement were invalidated, therefore, they would not be entitled to promotion. Accordingly, they cannot appeal from the settlement as nonparties with an interest in the order below.

*Hispanic Soc'y*, 806 F.2d at 1152. The situation is, of course, much different in the case before us. While it is true that all counsel fees would be paid by the insurance carrier that provides Texaco with officers' and directors' liability insurance, the interests of the corporation and its stockholders still would be affected by the payment. Although counsel for plaintiffs have obtained the assurance of counsel for Texaco that the insurance premiums were not increased as a result of the proposed settlement when the insurance policy was renewed in a then-soft market, the corporation's premium might well have been reduced upon renewal but for the proposed settlement. Moreover, the substantial payment ordered has not yet been paid and may call for increased premiums in years to come. These possibilities, and the discouragement of attorneys from instituting future lawsuits of this type against Texaco, give Rand an affected interest in the fee order in this case.

Affirming our determination in *Hispanic Society*, the Supreme Court wrote as follows:

> The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled. *See, e.g., United States ex rel. Louisiana v. Jack*, 244 U.S. 397, 402, 37

S.Ct. 605, 607, 61 L.Ed. 1222 (1917); Fed. Rule App. Proc. 3(c) ("The notice of appeal shall specify the party or parties taking the appeal"). The Court of Appeals suggested that there may be exceptions to this general rule, primarily "when the nonparty has an interest that is affected by the trial court's judgment." 806 F.2d at 1152. We think the better practice is for such a nonparty to seek intervention for purposes of appeal; denials of such motions are, of course, appealable.

*Marino*, 484 U.S. at 304, 108 S.Ct. 586. It is significant that the Supreme Court did not reject our rule permitting appeal by nonparties with affected interests. It merely identified intervention as "the better practice." Indeed, the later affirmance of *Felzen* by an equally divided Supreme Court demonstrates that the Court has yet to reject a rule that allows an appeal by a nonparty having an interest affected by the judgment of the trial court. *See Rutledge v. United States*, 517 U.S. 292, 304, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) (judgment affirmed by equally divided court not entitled to precedential weight).

Counsel for plaintiffs bring to our attention an order of a motions panel of this Court denying a motion by a nonparty stockholder for leave to file an appeal in this case. The movant was required to obtain leave by reason of a prior leave-to-file sanction issued against her. The application was denied on the ground that the movant was a layperson and not entitled to appear pro se to pursue a stockholders' derivative suit. *See Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir.1997). As an alternative reason for denial of the motion, the motions panel noted that only parties may appeal from an order or judgment, citing *Marino* and *Felzen*. We may disregard the alternative reason because it is dictum, because such an order is without precedential authority, and because we are entitled to revisit the decision of a motions panel. Having in mind the discretionary nature of the law of the case doc-

trine, a merits panel of this court recently revisited a motions panel decision denying a motion to dismiss an appeal for lack of jurisdiction and dismissed the appeal as untimely. *See Rezzonico v. H & R Block, Inc.*, 182 F.3d 144 (2d Cir.1999). In holding that such reconsideration was proper, "we join[ed] nearly every other Circuit that has considered this question." *Id.* We therefore reject counsel's efforts to rely on the earlier order in this case.

## II. *Counsel Fees.*

A stockholders' derivative action has been described as "an action brought by one or more stockholders of a corporation to enforce a corporate right or remedy a wrong to the corporation in cases where the corporation, because it is controlled by the wrongdoers or for other reasons, fails and refuses to take appropriate action for its own protection." 19 Am.Jur.2d *Corporations* § 2250, at 151 (1986) (footnotes omitted). It has long been the rule that the plaintiffs in such an action may recover attorneys' fees out of any common fund created as the result of their successful efforts on behalf of the corporation. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). It is by now also well established that an award of counsel fees is only justified where the derivative action results in a substantial non-monetary benefit to a corporation. *See id.* at 395, 90 S.Ct. 616. The *Mills* Court quoted with approval a decision of the Supreme Court of Minnesota defining "substantial benefit" as

> "something more than technical in its consequence and ... one that accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest."

*Id.* at 396, 90 S.Ct. 616 (quoting *Bosch v. Meeker Coop. Light & Power Ass'n.*, 257 Minn. 362, 366–67, 101 N.W.2d 423 (1960)).

In *Mills*, minority stockholders bringing the derivative action successfully established their claim that a proxy statement pertaining to an upcoming merger was materially misleading and violative of § 14(a) of the Securities Exchange Act of 1934 and Rule 14a–9 adopted thereunder. *See* 396 U.S. at 386, 90 S.Ct. 616. Despite the fact that no monetary fund was created (or sought to be created), the Court held that the plaintiffs had "rendered a substantial service to the corporation and its shareholders," *id.* at 396, 90 S.Ct. 616, and that the award of attorneys' fees to the successful plaintiffs therefore would be proper. The Court concluded that, "regardless of the relief granted, private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders by providing an important means of enforcement of the proxy statute." *Id.* (footnote omitted).

Along similar lines, we were confronted in *Kopet v. Esquire Realty Co.*, 523 F.2d 1005 (2d Cir.1975), with the issue of attorneys' fees in a class action involving claims of violations of the Securities Act of 1933 for failure to file a registration statement relating to the refinancing of property by a limited partnership. Citing *Mills*, we determined "that appellant rendered a service to the partnership by vindicating the statutory policy against unregistered offerings." *Id.* at 1008. In remanding for the award of counsel fees, we observed that the partnership had "received substantial benefits from appellant's efforts in the litigation before it, including the production of certified financial statements." *Id.* at 1009. In *Kopet* we also noted precedent cases holding that "federal courts may award counsel fees based on benefits resulting from litigation efforts even where adjudication on the merits is never reached, *e.g.*, after a settlement." *Id.* at 1008.

Non-monetary benefits were also held to form the basis for a fee award in *Koppel v. Wien*, 743 F.2d 129 (2d Cir.1984). There, the plaintiffs were limited partners in a

real estate venture formed for the purpose of acquiring the St. Moritz Hotel in New York City. *See id.* at 131. The defendants were general partners who solicited approval of a modification agreement that would allow them a greater share in the sale of the property. Plaintiffs commenced an action to enjoin the amendment of the partnership agreement, asserting that the defendants' solicitation contained statements and omissions in violation of the Securities Exchange Act of 1934. *See id.* Ultimately, the defendants withdrew the solicitation. Reversing the district court's denial of counsel fees, we once again recognized that the attainment of non-monetary benefits may justify an award of counsel fees, holding "that a substantial benefit sufficient to support an award of plaintiffs' attorneys' fees was conferred upon the participants in the partnership and remand[ing] for an evidentiary hearing to determine whether that benefit was caused by the litigation." *Id.* In so holding, we reiterated the "well established [rule] that non-monetary benefits, such as promoting fair and informed corporate suffrage or deterring future misconduct by management may support a fee award." *Id.* at 134–35 (citations omitted).

 But the action that gives rise to this appeal is not grounded in the Securities Exchange Act or any other federal statute. It is a diversity action grounded in state law claims of breach of fiduciary duty, corporate waste and mismanagement and violation of contractual obligations. Accordingly, state law governs the issue of counsel fee availability. *See Lewis v. S.L. & E., Inc.,* 629 F.2d 764, 773 n. 21 (2d Cir.1980). Our determination in the case before us therefore must be bottomed on New York law. Attorneys' fees may be awarded under New York law to an attorney for a successful derivative plaintiff out of a recovery obtained on behalf of the corporation from the defendants. *See* N.Y. Bus. Corp. Law § 626(e) (McKinney 1986). Attorneys' fees may also be paid from corporate funds under New York law

where benefits to the corporation arising from the derivative action are therapeutic in nature. *See Seinfeld v. Robinson,* 246 A.D.2d 291, 676 N.Y.S.2d 579, 582 (1st Dep't 1998).

*Seinfeld* was a derivative action brought by certain shareholders of American Express Co. for redress of misconduct on the part of officers, directors and employees of the corporation. The action had its genesis in the purchase by American Express of the Geneva-based Trade Development Bank from Edmond J. Safra. *See id.* at 580. The corporation merged the Bank into its international banking arm, and Safra continued as its Chairman. After a brief period, Safra resigned on account of conflicts with James Robinson, the Chairman and CEO of American Express, and agreed not to start a new bank for four years. When the four-year period ended, American Express became concerned that Safra would return to the banking business and regain his former customers. An executive in the American Express public relations department was assigned to investigate Safra, with the object of finding evidence that could be used to prevent the issuance of a new Swiss banking license. To assist in this effort, the public relations executive hired one Greco, a private detective with a criminal past. *See id.*

After Safra was issued the Swiss license and opened a new bank in Geneva, scandalous articles about him appeared in the press. These articles charged various acts of misconduct, including money-laundering, drug trafficking, organized crime associations and the like. After a great deal of effort, Safra was able to identify Greco and the public relations executive as the people who placed the false stories. Rather than proceed with any claims relating to the wrongs perpetrated against him, Safra settled for a public apology by Robinson on behalf of American Express and an agreement by the corporation to donate $8 million to charities designated by Safra. *See id.* at 581.

Eight American Express shareholders joined in a derivative action seeking various forms of relief, including money damages and attorneys' fees, against the officers and employees of the corporation said to be responsible for the malignment of Safra. That action was settled by a stipulation requiring approval by the general counsel of American Express of any contract to hire outside investigators at a cost of more than $150,000 and a confirmation by any such investigator that he has read the corporate "Code of Conduct." The stipulation also provided that the corporation would not acquire more than fifty percent of any investment banking business for four years without the approval of a majority of its outside directors. The trial court found that no substantial benefit was achieved in the derivative action and denied attorneys' fees to the plaintiffs. *See id.* at 581.

In reversing, the state appellate court applied the "substantial benefit" standard, although it noted that certain federal decisions in the Southern District of New York apparently had applied more lenient standards. *See id.* at 583. The court adopted the rule in *Mills* and cited with approval the *Kopet* and *Koppel* holdings of this Court. Remanding for computation of counsel fees, the state appellate court determined that the benefits gained by the *Seinfeld* plaintiffs "are precisely the type of 'corporate therapeutics' the Supreme Court deemed a substantial benefit in *Mills*." *Id.* at 584. Characterizing the clandestine activities of American Express as a deceit upon the shareholders of the corporation, the Court stated that "in implementing procedures that will prevent the exact sequence of events from reoccurring, petitioners have furnished a benefit to all shareholders." *Id.*

█ The parties before us agree, as did the parties in *Seinfeld,* that the plaintiffs in a derivative action are entitled to counsel fees upon a settlement of the action only when the non-monetary, therapeutic benefits obtained are substantial in nature.

Even under the most liberal definition of "substantial benefit," the settlement in the case before us does not meet the test. The action was commenced with a worthy goal—to require the officers, directors and employees responsible for Texaco's discriminatory policies to reimburse the corporation for the millions of dollars expended as a result of the necessary settlement of the *Roberts* litigation. This action was of course "piggy-backed" on the *Roberts* action, in which the settlement involved extensive provisions for the remedy of past discrimination and for the setting of a course for a non-discriminatory future as well as for substantial monetary relief. This is not a case like the earlier cases in this Circuit that were instituted to remedy securities violations and resulted in relief that accomplished their goals. Nor is this a case like *Seinfeld,* where the settlement devised a plan to prevent a sequence of misconduct from reoccurring. Indeed, the relief sought by the plaintiffs in this case never was achieved.

Far from providing a remedy for clearly identified past misconduct, the settlement in this case strives to provide therapeutic "benefits" that can only be characterized as illusory. As to the first "benefit," the inclusion of a statement in the 1997 Annual Report to Shareholders that the public portion of the annual report of the Fairness Task Force is available on request, there never was any claim that the report was *not* available to stockholders on request. The report is a public document, available to all persons from the court. Presumably, the report is also available (as are most public documents of this kind) on the Internet. Publishing a notice to the shareholders of the availability of the report therefore adds nothing of value to the *Roberts* settlement, pursuant to which the Task Force was created. The Task Force was established with a five-year duration, and the fact that the notice is to be published in only one Annual Report to shareholders is indicative of the cosmetic nature of this provision. *See Mokhiber v. Cohn,*

608 F.Supp. 616, 628 (S.D.N.Y.1985) ("We do not believe that equity should authorize compensating a stockholder or his attorney for bringing about ... purely 'cosmetic' and ephemeral changes."), *aff'd*, 783 F.2d 26 (2d Cir.1986).

The second substantive provision of the settlement, the inclusion of a non-discrimination statement in all contracts entered into between Texaco and outside vendors, also fails to serve as a remedy for past misconduct. There never was any claim, either in *Roberts* or in the case at bar, that Texaco discriminated in its relations with its vendors. The law prohibits such discrimination in any event, *see* 42 U.S.C. § 1981, and there is no reason to believe that a contractual non-discrimination provision adds anything to the rights of vendors. Interpreting the insertion of the "Statement of Equity and Tolerance Objectives" in vendor contracts as a requirement that vendors not discriminate, there has been no showing, or even allegation, of discriminatory conduct on the part of any of Texaco's vendors either. The fact that counsel for Texaco assured the Special Master, in response to an inquiry from the Special Master, that the directors and officers could be subject to *another* derivative suit if they failed to police the vendors adds nothing but an additional and especially burdensome layer to existing remedies.[2] Those who are subject to discrimination by Texaco's vendors are perfectly capable of suing on their own behalf. The provision in question can only be characterized as "ephemeral." *Mokhiber*, 608 F.Supp. at 628.

In an effort to justify an award of fees, counsel for plaintiffs point to the great obstacles they faced in bringing the derivative action to a successful conclusion. These included the protections afforded the directors by the business judgment rule, the limited liability provisions of Tex-

aco's corporate charter, and the failure of plaintiffs to make the demand for remedial action prior to suit required by Fed. R.Civ.P. 23.1. Rather than providing a reason to allow fees to counsel for their superficial accomplishments in this case, these arguments raise questions about counsel's compliance with Fed.R.Civ.P. 11. That rule specifies that counsel's signature on a pleading certifies that "the claims ... and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b)(2).

As far as can be ascertained, no argument has been made for the extension of current law or the establishment of new law with regard to stockholders' derivative actions. An argument therefore could be made, on the basis of the contentions now advanced by plaintiffs' counsel, that the extensive claims originally made in this case had no chance of success and, accordingly, were made for the improper purpose of early settlement and the allowance of substantial counsel fees. *See* Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 Duke L.J. 945, 948–53 (1993) (noting that a large percentage of stockholders' derivative actions are brought solely to collect attorneys' fees).

It is sufficient for our purposes here to say that the settlement of this particular derivative action provided no substantial benefit to the corporation or its shareholders and that attorneys' fees are not justified under the circumstances. We therefore find it unnecessary to review the appellant's objection to the computation of the fees, including the use of a multiplier.

---

**2.** This assurance of counsel was given despite the following limitation in the contractual non-discrimination provision: "Any failure by Texaco to act in accordance with this obli-

gation will not give rise to any cause of action or third-party beneficiary right in favor of any person or entity other than Texaco."

## CONCLUSION

We reverse the judgment of the district court and remand for the entry of judgment denying counsel fees.