OPINION OF THE COURT
Stephen G. Crane, J.
This is a stockholders’ derivative action brought in the right, and for the benefit, of the American Express Company (Amex). A hearing was held in this court on November 14, 1996, pursuant to Business Corporation Law § 626 (d) and (e) for judicial approval of (1) a proposed settlement of this consolidated action and (2) the application of plaintiffs’ counsel for an award of attorneys’ fees and reimbursement of expenses to be paid by Amex.
A notice dated July 22, 1996 (the Notice of Hearing) was sent to all persons who were record holders or beneficial owners of Amex common stock as of June 30,1996, informing them of the November 14 hearing and of their right to appear and show cause why the court should not approve the proposed settlement or should not grant the award of attorneys’ fees and the reimbursement of expenses.
The essential facts of this action were discussed in several prior decisions, as well as in the Notice of Hearing, familiarity of which is presumed. At the relevant times, plaintiffs were Amex shareholders and defendants were officers or directors of Amex. Defendant James D. Robinson, III (Robinson), was chairman and chief executive officer, defendant Harry L. Freeman (Freeman) was an executive vice-president who reported directly to Robinson, and the other named defendants were the then current members of Amex’s board of directors.
In 1983, Amex acquired the Geneva-based Trade Development Bank from Edmond J. Safra (Safra) and, as part of that transaction, Amex appointed Safra chairman of the American Express Bank. Safra resigned from that position in 1984, after signing a noncompetition agreement. Shortly thereafter, Amex launched an investigation of Safra, suspecting that he was hiring away employees and competing with the bank. This investigation led to various magazine and newspaper articles linking Safra to criminal organizations and activities.
*161 Safra threatened to sue Amex, alleging that individuals associated with Amex wrongfully engaged in a campaign to disparage him, namely, Susan Cantor (Cantor) and Anthony Greco (Greco). Cantor was a senior vice-president at American Express Bank and a named defendant in the Ferber and Lewis actions, which were consolidated with the Seinfeld action. Greco had a record of arrests and convictions in Italy and the United States going back to 1962. According to a lengthy article in the September 24, 1990 edition of the Wall Street Journal, Greco reported to Cantor who, in turn, reported to Freeman, who was one of Robinson’s closest aides. The article also reported that Robert Smith, Safra’s successor as chairman of the American Express Bank, became obsessed with stopping what he perceived to be Safra’s efforts to compete with Amex.
Amex and Safra avoided litigation. In July 1989, Amex announced that it had entered into an agreement with Safra, whereby Amex agreed to donate $8 million to various charities designated by Safra in exchange for Safra’s agreement to release Amex from any liability associated with his claims against it. Thereafter, Amex’s board of directors asked its Audit and Public Responsibility Committee (the Audit Committee) to review Safra’s allegations, investigate the underlying facts, and report its findings to the board.
The Audit Committee determined that Amex employees had not purposely disseminated inaccurate information; instead, their actions caused a chain of events that resulted in the maligning of a competitor. The Committee concluded that it was not in the best interests of Amex or its shareholders to initiate litigation regarding the Safra matter. Meanwhile, in August 1989, one of the named plaintiffs in the action at bar made a demand upon the board of directors to take legal action as a result of the Safra matter. Amex’s board advised plaintiff, however, that it agreed with and adopted the Audit Committee’s report.
Although receiving less attention, this litigation also concerns the allegation that Amex failed to monitor adequately its substantial investment in Shearson, Lehman, Hutton, Inc. (Shearson), an acquisition that eventually resulted in huge financial losses.
Seinfeld Complaint
In October 1990, plaintiffs Harold Sachs and Frank David Seinfeld commenced actions in the Supreme Court, New York County, derivatively on Amex’s behalf, against the then cur *162 rent members of Amex’s board of directors and Freeman, a high-ranking Amex officer who figured prominently in the Safra matter. The two related actions, Ferber v Robinson and Lewis v Robinson, were consolidated into the Seinfeld action and the Seinfeld complaint was designated as the consolidated complaint in the consolidated action.
The complaint alleges that the Safra and Shearson matters caused Amex financial loss and damaged its reputation. It alleges that the Safra matter wasted corporate assets, measurable in company funds allocated to pay $8 million in charitable contributions and the fees incurred by Amex for outside law firms and accountants, as well as damage to Amex’s reputation. Plaintiffs allege that Amex’s directors breached their fiduciary duties by failing to ensure that there were adequate systems of internal control to protect against the conduct in the Safra matter.
Plaintiffs also allege that Amex managers failed to monitor adequately Amex’s substantial investment in Shearson, resulting in substantial losses, including a $1 billion loss in 1991 due to write-offs and restructuring costs.
As relief, plaintiffs sought:
(1) a declaration that defendants breached a fiduciary duty to Amex, an accounting, and damages sustained by Amex as a result of the defendants’ wrongful conduct,
(2) a requirement that Freeman return all salaries and other money paid during the period of his wrongdoing, and
(3) counsel fees and costs.
The Proposed Settlement
The parties have stipulated to settle (the Stipulation of Settlement) the consolidated action by Amex’s agreement to adopt two corporate governance resolutions. Because all parties favor the proposed Settlement, plaintiffs have not demonstrated a likelihood of prevailing, and the litigation has been ongoing since 1990, approval of the Settlement is warranted. (State of New York v Reebok Intl., 903 F Supp 532, 535-536 [SD NY 1995], appeal dismissed 96 F3d 44 [2d Cir 1996].)
The Fee Request
The fee request encompasses the work of eight law firms (collectively Counsel), all of whom represented the various plaintiffs in the consolidated action: Abbey & Ellis (lead counsel); Chimicles, Jacobsen & Tikellis; Greenfield & Rifkind *163 L. L. P.; Goodkind Labaton Rudoff & Sucharow; Levin, Fishbein, Sedran & Berman; Milberg Weiss Bershad Hynes & Lerach L. L. P.; Wechsler Harwood Halebian & Feffer L. L. P.; and Wolf Haldenstein Adler Freeman & Herz L. L. P.
The Stipulation of Settlement provides that Counsel will apply to the court for an aggregate award of attorneys’ fees and reimbursement of expenses to be paid by Amex in an amount not to exceed $3.5 million. The eight firms seek an aggregate fee award of $3,272,392, based on an expenditure of 7,732.55 hours of work, and an expense reimbursement of $227,607.73, for a total payment by Amex of $3,499,999.73.
In support of its request, Counsel contends that (1) the Settlement provides a substantial benefit to Amex in that the corporate governance measures are designed to prevent a recurrence of the alleged wrongdoing, (2) plaintiffs’ and defendants’ counsel are very experienced in these types of actions and produced high quality work, (3) although 300,000 notices were disseminated to Amex shareholders, plaintiffs received only a small number of objections, (4) the fee request reflects the benefit achieved and the risks undertaken by Counsel, (5) Counsel has been involved in the litigation since 1989, advanced expenses of $227,607.73, and received no fees during the past seven years, and (6) the resolutions exceed the type of relief that plaintiffs would have obtained if the lawsuit had been litigated to its conclusion.
Counsel emphasizes that the monetary damages flowing from the Safra matter ($8 million) is minimal to Amex but the harm to its reputation — its greatest asset — is far more significant. Therefore, Counsel contends that the corporate governance measures obtained in the Settlement constitute substantial and valuable benefits for Amex. Resolution I is designed to avoid the occurrence at the senior management level of Amex’s retention of investigators of special projects and will ensure than no such event could occur at the highest corporate levels without the oversight of General Counsel and the Amex board of directors. Resolution II will ensure the reasoned exercise of business judgment by independent outside directors in any major acquisitions of investment banking companies.
Counsel submitted an affidavit by Professor Theodore Fiflis, who concluded that the resolutions are of immeasurable importance to the company because they provide assurance to investors and employees that similar misadventures will not recur and if Resolution I had been in place in the 1980’s, it probably would have prevented the abuses in the Safra affair.
*164 Ten shareholders submitted written objections to the attorneys’ fees application. One of those shareholders, William C. Rand, also appeared at the November 14, 1996 hearing to object to the application for attorneys’ fees. Rand argued that plaintiffs’ lawyers have not obtained any material benefit for Amex and that the award increases the amount of the alleged corporate waste related to the Safra matter from $8 million to $11.5 million. Rand contended that the resolutions aré ineffective because they can easily be avoided by hiring outside investigators for short assignments whose compensation will amount to less than $150,000 per engagement and that Amex allegedly paid Greco in $30,000 amounts. He also argued that the resolutions are of no benefit because Amex had already adopted similar policies regarding outside investigators and that plaintiffs have not provided any facts indicating that the Audit Committee was not an independent and disinterested committee.
Generally, the prevailing party in a lawsuit is not entitled to an award of attorneys’ fees unless an agreement, statute, or court rule authorizes the award. (Glenn v Hoteltron Sys., 74 NY2d 386.) This New York rule is consistent with the "American Rule” which requires each side to bear its own attorneys’ fees in the absence of express statutory authorization to the contrary. (Alyeska Pipeline Co. v Wilderness Socy., 421 US 240.)
Here, that statutory authorization — Business Corporation Law § 626 (e) — provides that a successful plaintiff in a shareholder derivative suit may recoup legal fees from the proceeds of a judgment or a settlement. (Glenn v Hoteltron Sys., 74 NY2d 386, supra.) It is not necessary that the suit produce a monetary recovery. (Mills v Electric Auto-Lite, 396 US 375 [1970].) Counsel has failed to demonstrate, however, that this protracted lawsuit, and its resulting settlement, benefits either Amex or its shareholders. Thus, for the reasons set forth below, the request of plaintiffs’ counsel for an award of attorneys’ fees and reimbursement of expenses is denied.
First, plaintiffs have not prevailed in this action. A court may deny a request for a fee award, thereby refusing to charge the company with the action’s expense, where it is found that the corporate defendants acted for a bona fide business purpose. (Montro Corp. v Bishop, 6 AD2d 787.) The complaint alleges that the director defendants acted recklessly and were grossly negligent. The directors deny any wrongdoing, contending that they had no actual knowledge of the underlying events and that their actions are protected by the business judgment rule. The Settlement imposes no liability upon any of them.
*165 Significantly, in propounding the Settlement, Counsel concedes that the obstacles to prevailing in a derivative action are substantial, given the deference that New York law accords to the exercise of business judgment by a company’s board of directors and special committees of the board. (Auerbach v Bennett, 47 NY2d 619.)
This is especially true here. The Amex board asked its Audit Committee to review Safra’s allegations, to investigate the underlying facts, and to report its findings to the board. The five-person Audit Committee was composed entirely of outside directors, none of whom is alleged to have been involved in the Safra matter. The Committee retained three prominent law firms — Schulte, Roth & Zabel, Vinson & Elkins, and Skadden Arps Slate Meagher & Flom — to conduct the investigation and provide legal advice. The Honorable John Martin, a former United States Attorney and then Schulte, Roth partner, and currently a United States District Judge, led the investigation. The law firms, in turn, retained a prominent accounting firm to assist in the investigation.
As described in a prior decision in this action (Mazzarelli, J., Aug. 23, 1993), in its investigation the Committee’s counsel conducted interviews, obtained Amex’s files regarding notes, correspondence, expense vouchers, and travel and reimbursement records of those acting for Amex in the Safra matter, prepared an event chronology, and provided the Committee with materials prepared by the accounting firm. Upon reviewing these materials and with the assistance of counsel, the Committee issued a report to Amex’s board of directors detailing the investigation and the factual and legal basis for its conclusion that it would not be in the best interests of Amex or its shareholders to pursue litigation over the Safra matter. Where plaintiffs have not demonstrated bad faith or fraud, a court must respect the decision of a board’s special committee. (Parkoff v General Tel. & Elecs. Corp., 74 AD2d 762, affd 53 NY2d 412, rearg denied 54 NY2d 832.)
In addition, as stated in the Stipulation of Settlement, Cantor’s dismissal motion was likely to be granted because plaintiffs failed to demonstrate that she breached a fiduciary duty to the company. Moreover, Freeman, the Amex employee most closely identified with the alleged wrongdoing, resigned shortly after Amex’s public announcement of the Safra matter and prior to the commencement of litigation. Robinson also resigned during the pendency of the litigation. The Settlement does not achieve the relief sought in the complaint, namely, to *166 hold Freeman or Robinson accountable for alleged misconduct. Nor does it, as discussed above, hold the director defendants accountable for the alleged misconduct. Moreover, the record does not reveal that plaintiffs’ actions caused Robinson’s resignation. (Barton v Drummond Co., 636 F2d 978 [5th Cir 1981].)
Furthermore, in exchange for a speculative benefit, plaintiffs have dropped their claim to hold the alleged wrongdoers accountable. The Settlement gives defendants complete and permanent immunity from "any and all claims, rights or causes of action, whether known or unknown, that have been, could have been or in the future might be asserted by plaintiffs”. Adopting the resolutions for a four-year period is an inexpensive premium to pay for such assurance. (Cf., Weissman v Alliance Capital Mgt. Corp., 650 F Supp 101 [SD NY 1986].)
Second, this action has not produced a tangible benefit for Amex or its shareholders. That Amex agreed to adopt both sets of resolutions, presumably as a means of terminating a costly lawsuit, does not automatically entitle plaintiffs’ counsel to a fee award. For an attorney’s fee award depends, in large measure, on the benefits derived by the corporation from the successful efforts of the attorneys on the corporation’s behalf. (Ripley v International Rys., 16 AD2d 260, affd 12 NY2d 814.) Indeed, the benefit to the corporation and the general body of shareholders must be "substantial” to prevent derivative actions from becoming "purely strike suits of great nuisance and no affirmative good”. (Schechtman v Wolfson, 244 F2d 537, 540 [2d Cir 1957].) No substantial benefit was achieved here.
Amex’s agreement to adopt these resolutions cannot be fairly characterized as a "vindication of a corporate right of action”. (Mills v Electric Auto-Lite, 396 US 375, 394, supra.) Resolution I fails to remedy the allegation that Amex officers and directors breached a fiduciary duty and that such breach resulted in Amex’s agreement to make an $8 million charitable contribution to settle Safra’s claims against the company. Counsel concedes that Amex would likely have used the Safra funds for charitable contributions anyway.
Counsel’s assertion that Resolution I would have prevented the Safra matter is speculative. It only applies to payments exceeding $150,000 and the resolution expires after a four-year period. Considering the unique circumstances and the individual personalities involved in the Safra matter, a reoccurrence is unlikely. Adoption of "cosmetic” and "ephemeral” guidelines do not constitute a tangible nonmonetary benefit for which stockholders’ attorneys merit compensation by the company. *167 (Mokhiber v Cohn, 608 F Supp 616, 628 [SD NY 1985], affd 783 F2d 26 [2d Cir 1986].)
Counsel’s argument that Resolution II is of value is also unpersuasive. Resolution II’s sole function is to require the approval of a majority of the outside directors of Amex’s board for the acquisition of a "significant subsidiary” investment banking business. That plaintiffs commenced this lawsuit in contravention of the advice of a board committee — consisting of only outside directors — contradicts Counsel’s assertion that Resolution II is of any value to the company.
In contrast to the situation presented here, fee awards are warranted where the result directly impacts upon the complained of conduct. (See, e.g., Elite of N. Y. Cars v Zarbhanelian, 215 AD2d 429 [$250,000 in corporate debt was forgiven], lv denied 86 NY2d 711; Mencher v Sachs, 39 Del Ch 366, 164 A2d 320 [1960] [cancellation of illegally issued stock]; Kopet v Esquire Realty Co., 523 F2d 1005 [2d Cir 1975] [substantial benefits from producing certified financial statements covering past years of the partnership’s business, arresting an existing 1933 Securities Act violation, giving certain limited partners the rescission rights, and deterring future conduct];[1] Ramey v Cincinnati Enquirer, 508 F2d 1188 [6th Cir 1974] [derivative suit delayed consummation of the risky repurchase plan permitting a more attractive offer and it exposed inaccuracies and misleading statements in the proxy materials], cert denied 422 US 1048.)[2]
Here, the alleged wrongdoers suffer no liability and Amex does not recoup any of its financial losses. Counsel’s attempt to minimize the value of obtaining a monetary recovery is *168 unconvincing. Recovery of the financial losses was the object of plaintiffs’ prelitigation demands upon the company and the object of these actions. Hence, either a greatly reduced fee or no fee at all is warranted. (See, e.g., Schechtman v Wolfson, 244 F2d 537, supra [fee request denied in suit to enjoin directors from serving on two rival corporations simultaneously where, after Trial Judge denied dismissal motion, the directors resigned from rival corporation]; Montro Corp. v Bishop, 6 AD2d 787, supra [fee request denied where attacked investment was made for a bona fide business purpose]; Carroll v Blinken, 105 F3d 79 [2d Cir 1997] [fee award of $25,000 rather than requested $558,156.25 is reasonable because plaintiff obtained only minimal relief that has no systemic effect of importance and served no larger public interest].)
As stated in the Notice of Hearing, the director defendants produced over 5,600 pages of documents to plaintiffs, including the Audit Committee report, documents gathered from Amex’s files by the Committee’s Counsel, Committee correspondence, questionnaires completed by the Committee’s members concerning their independence and disinterestedness, memoranda of witnesses’ interviews conducted during the investigation, and a chronology prepared by the Committees’ Counsel. In addition, a Special Referee was appointed to rule upon a dispute over 1,000 documents on the grounds of attorney-client privilege and attorney work product. Thus, the major benefit to the company is the termination of expensive and time-consuming litigation. (United Operating Co. v Karnes, 482 F Supp 1029 [SD NY 1980].)
Third, Counsel’s argument, that it achieved a great benefit because adoption of the resolutions will enhance Amex’s reputation, is conclusory and unconvincing. Counsel has not cited any authority, nor is the court aware of any, where an award of attorneys’ fees was granted in a derivative action based upon the assertion of enhanced reputation.
Moreover, Counsel has not demonstrated that their efforts have enhanced Amex’s reputation. The business judgment doctrine charges a company’s board of directors with the duty of making decisions that affect a company’s reputation; the doctrine embraces the weighing and balancing of promotional and public relations factors, as well as legal and commercial considerations. (Auerbach v Bennett, 47 NY2d 619, 631, supra.) The Amex board, in exercise of its business judgment, determined not to pursue litigation.
That Counsel has not demonstrated that this action, together with the resulting settlement, will enhance Amex’s reputation *169 is revealed by the unanimous opinion of all Amex shareholders who responded to the Notice of Hearing. Counsel’s disparagement of the relatively small number of responding shareholders is unpersuasive; the record contains not a single supporting shareholder.[3] In United Operating Co. v Karnes (482 F Supp 1029, 1032, supra), the court stated: "Moreover, the Court is not unmindful of the complaints of the individual stockholders who urge that no fee be awarded in this situation since the suit was unwarranted and that to pay a fee in these circumstances merely encourages meritless litigation. It does stand to reason that, if a contingency increment is given to successful litigation, some penalty should be available for what is substantially unsuccessful litigation. (If the case had been tried and lost, plaintiff’s counsel could still have made a fee application, but his chances of any substantial recovery would not have been great.)”
Furthermore, Counsel’s prelitigation correspondence to Amex Getters dated July 31, 1989 and Aug. 1, 1989), demanding that Amex take whatever steps are necessary to recover the $8 million Safra payment, belies Counsel’s argument that this lawsuit will enhance Amex’s reputation. Counsel emphasized then that Amex’s publicly disclosed payment to settle the Safra matter was "embarrassing”. Granting the fee request would increase Amex’s litigation costs to an amount approximating what it paid to resolve the Safra matter.[4]
Fourth, that Amex does not oppose the fee application is not dispositive. (Mokhiber v Cohn, 608 F Supp 616, 628, affd 783 F2d 26 [2d Cir 1986], supra.) Otherwise, the statutory requirement of judicial approval would be meaningless. Counsel argues that the fee request is reasonable in that it resulted from arm’s length bargaining and it represents the parties’ own resolution of the value of Counsel’s services. The Stipula *170 tion of Settlement contemplates, however, that the Settlement may be approved and the fee request denied. Since Amex has agreed to pay the fee, it would be easy for the court to simply fix the fees at the level sought. "However, the Court can find no reason thus to reward and encourage litigation which is settled to produce such scant benefit for the shareholders.” (Weissman v Alliance Capital Mgt. Corp., 650 F Supp 101, 104, supra.)
Fifth, as a matter of policy, awarding fees here would have the detrimental effect of penalizing the company for negotiating a reasonable settlement of its dispute with Safra. Settlement of the Safra matter had the beneficial effect of avoiding litigation, with its attendant unfavorable publicity.
Sixth, assuming arguendo that the resolutions provide some benefit, that the fee request is excessive militates against awarding any fee. (Brown v Stackler, 612 F2d 1057 [7th Cir 1980].)
If, as appellant argues, the court were "required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.” (Brown v Stackler, supra, at 1059.) Moreover, successful counsel in derivative and class actions are typically awarded enhancements under "lodestar” formulas and, therefore, some penalty should be available for what is essentially unsuccessful litigation. (United Operating Co. v Karnes, 482 F Supp 1029, supra.)
Amex avoided litigation with Safra by negotiating a modest settlement. Its board of directors thoroughly considered the effects of the Safra matter and concluded that it was not in the best interests of Amex or its shareholders to initiate litigation. Nevertheless, plaintiffs commenced protracted, time-consuming, and expensive litigation that diverted Amex from its business. Counsel was not successful in obtaining a meaningful benefit for either the company or its shareholders.[5]
A fee award is appropriate where allowing "others to obtain full benefit from the plaintiff’s efforts without contributing *171 equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs expense.” (Mills v Electric Auto-Lite, 396 US 375, 392, supra.) No such enrichment occurred here.
Accordingly, it is ordered that the proposed Settlement of this consolidated action is approved; and it is further ordered that Counsel’s request for an award of attorneys’ fees and reimbursement of expenses is denied.
[Portions of opinion omitted for purposes of publication.]

. Kopet v Esquire Realty Co. (523 F2d 1005, supra) has been cited as standing for the proposition that deterring future misconduct by management constitutes a substantial benefit. (Shields v Murphy, 116 FRD 600, 605 [D NJ 1987].) In Kopet, however, the court also found that the action caused the company to produce certified financial statements covering past years of the partnership’s business, arrested an existing 1933 Securities Act violation, and gave certain limited partners rescission rights.

. Other examples justifying a fee award include: suits by stockholders complaining that corporate shares of stock had been issued for inadequate consideration, resulting in the cancellation of such shares; suits by holders of voting trust certificates who succeeded in terminating the voting trust and obtaining for all certificate holders the right to vote their shares; and a suit resulting in a declaration invalidating the election of certain directors. (Mills v Electric Auto-Lite, 396 US 375, supra, citing Hartman v Oatman Gold Min. & Milling Co., 22 Ariz 476, 198 P 717; Matter of Allen v Chase Natl. Bank, 180 Misc 259; Bosch v Meeker Coop. Light & Power Assn., 257 Minn 362, 101 NW2d 423, respectively.)

. Typical comments include: "As an American Express stockholder I’m outraged that the only winners in this suit are the plaintiffs attorneys to the tune of $3.5 million”; "Being a stockholder of American Express, I am amazed that this seemingly frivolous case would even be listened to by the court. The end result may be that American Express shareholders share costs of about 11.5 million dollars rather than the 8 million original costs resulting from the ’Safra’ agreement”; "A court sanctioned payment of plaintiff attorney fees in this case would constitute a more obvious waste of corporate assets, force a breach of fiduciary responsibility and further damage the company”; "Amex’s contribution to Safra’s choice of charities is likely to be a 'good’ in itself.”

. Counsel seeks a $3.5 million award. Defense counsel estimated that Amex spent $2 million in defense but plaintiffs’ counsel contended at the hearing that Amex’s defense bill, in total, is closer to $4 million.

. Nothing in this decision detracts from the eminence of Counsel, the court’s esteem for them, or the accuracy of their reported hours expended on these matters. This makes all the more puzzling the prosecution of these derivative actions to the end actually produced. Perhaps, the explanation lies in a simple miscalculation of the business judgment rule and the board’s rejection of plaintiffs’ demand that Amex sue and protract even further the *171 Safra matter that had been concluded, mercifully, with some benefit for Amex.