OPINION OF THE COURT
Bernard J. Fried, J.
By motion sequence No. 002, plaintiffs seek an order dismissing this consolidated action as moot, and an award of attorneys’ fees and expenses, pursuant to Business Corporation Law § 626 (e). By motion sequence No. 003, individual plaintiff Ken Brown seeks payment of an incentive fee award of $25,000, in the event motion sequence No. 002 is granted. Defendants do not dispute that the consolidated action ought to be dismissed, but they strenuously oppose the award of attorneys’ fees, arguing that *458 the complaints comprising these shareholder derivative actions amount to nothing more than meritless strike suits that in no way caused any benefit to Goldman Sachs, and as such, do not give rise to an award of attorneys’ fees under New York law.
Motion sequence numbers 002 and 003 are consolidated for disposition.
Given the high profile nature of the substance of this consolidated action, as well as its unusual procedural posture, I begin with a discussion of the events leading up to the present moment.
On December 14, 2009, plaintiffs, Security Police and Fire Professionals of America Retirement Fund and Judith A. Miller, brought a shareholder derivative action on behalf of the Goldman Sachs Group, Inc. (Goldman), alleging that certain members of Goldman’s Board of Directors (the Board) and executive officers breached their fiduciary duties by reserving 50% of Goldman’s net revenues for employee compensation, without consideration as to whether or not such a payout was merited.[1] On January 5 and January 7, 2010, plaintiffs, Ken Brown[2] and Central Laborers’ Pension Fund,[3] respectively, commenced shareholder derivative actions against the same defendants, which contained similar allegations.[4] (Collectively, these three lawsuits will be referred to as the actions.)
On January 11, 2010, plaintiffs moved, by order to show cause, for expedited discovery in connection with their anticipated motion to enjoin the payment of Goldman’s 2009 bonuses. Plaintiffs simultaneously served upon defendants a request for *459 the production of documents relating to the reservation of 50% of net revenues for employee compensation. On January 12, I signed plaintiffs’ order to show cause and scheduled argument on the motion for January 25, 2010, at 10:30 a.m. By letter dated January 12, 2010, defendants sought a premotion conference to discuss their planned motion to dismiss.[5]
On January 21, 2010, defendants cross-moved for a protective order and a stay of discovery in connection with their anticipated motion to dismiss. On that same date, defendants issued a press release announcing Goldman Sachs’ earnings for the 4th quarter of 2009, and stating, inter alia, that its ratio of compensation and benefits to net revenues for 2009, at 38.5% was “its lowest as a public company” and down from 48% in 2008. (Barry aff, exhibit 1, at 1, 5.)[6]
In their papers in opposition to the cross motion, filed January 25, 2010, plaintiffs asserted that defendants’ decision to “abandon their long history of paying nearly 50% of net revenues as compensation, and to acquiesce to Plaintiffs’ demands . . . essentially conceded the merits of Plaintiffs’ claims.” (Plaintiffs’ mem in opposition to cross motion at 17-18.)[7] Plaintiffs concluded that, in light of this action taken by defendants, the expedited discovery was no longer needed, and the motion and cross motion were moot. Plaintiffs further indicated that they would therefore move to dismiss the actions. (Id. at 18.)
During the proceedings of January 26, 2010, the parties informed me that they planned to stipulate to the consolidation of the actions. They also agreed that plaintiffs’ pending motions would be withdrawn, that plaintiffs would file the present motion, and that all discovery was to be stayed pending decision on this motion. (See hearing tr 16-19, Jan. 26, 2010.)
What also became clear during the January 26, 2010 proceedings was that, although the parties appeared to agree that dis *460 missal of the consolidated action was the appropriate course of action, their respective rationales for this course were profoundly divergent. Plaintiffs assert that the Goldman Board took precisely the action that these lawsuits were intended to provoke, and that the lawsuits were, themselves, the catalyst for the Board’s decision. Defendants, on the other hand, contend that the Board of Directors had many reasons for reaching the decision it did, not one of which related to these actions.
It is this disagreement that is at the heart of the motion currently before me. Before I can reach a decision on this question, however, there are several other points of contention to be addressed.
I begin with that which is undisputed. The parties agree that Delaware law applies to substantive matters in this consolidated action, including'pre-suit demand requirements and fiduciary duties, and that New York law applies to matters of procedure. (See e.g. Kilberg v Northeast Airlines, 9 NY2d 34, 41 [1961] [“As to conflict of law rules it is of course settled that the law of the forum is usually in control as to procedures including remedies”].) The parties further agree that the question of whether plaintiffs’ counsel is entitled to attorneys’ fees is a question of procedure, and that it is, as such, governed by New York law. (See e.g. Bensen v American Ultramar Ltd., 1997 WL 317343, *13, 1997 US Dist LEXIS 8196, *45 [SD NY June 12, 1997 No. 92 Civ 4420 (KMW) (NRB)] [under New York’s choice of law rules, “the availability of attorney’s fees should be considered procedural”].)
The consensus, however, ends there. Although it is clear that New York law governs this question, the requirements imposed by New York upon a party seeking to recover attorneys’ fees in a shareholder derivative suit are in dispute.
Section 626 of New York’s Business Corporation Law provides the mechanism for bringing a shareholder derivative action. It requires the plaintiff in such an action to be a shareholder at the time the action is brought, and at the time of the transaction implicated in the lawsuit, and it further requires that “the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort.” (Business Corporation Law § 626 [b], [c].) Pursuant to subdivision (d), settlement or discontinuance of the action must be approved by “the court having jurisdiction of the action.” Finally, section 626 (e) provides:
*461 “If the action on behalf of the corporation was successful, in whole or in part, or if anything was received by the plaintiff or plaintiffs or a claimant or claimants as the result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff or plaintiffs, claimant or claimants, reasonable expenses, including reasonable attorney’s fees, and shall direct him or them to account to the corporation for the remainder of the proceeds so received by him or them.”
There is no dispute that this is the relevant subdivision for the purposes of plaintiffs’ application, and plaintiffs contend that New York courts have interpreted it to provide that “a fee award is appropriate if the plaintiffs achieved a ‘substantial benefit’ for the corporation.” (Plaintiffs’ mem in support at 28, quoting Seinfeld v Robinson, 246 AD2d 291, 294 [1st Dept 1998].)[8] In addition to this “substantial benefit” requirement, plaintiffs acknowledge that “the determination of entitlement to legal fees also involves a causation inquiry.” (Plaintiffs’ mem in support at 29.) In other words, it must be clear that the benefit obtained by the corporation was obtained as a result of the litigation initiated by plaintiffs. However, plaintiffs assert that the burden of proof on this question rests with the defendants, since their claims were mooted by the corrective action taken by defendants — the reduction of Goldman’s ratio of compensation and benefits to net revenue.
Plaintiffs argue that the substantial benefit realized by the corporation is the nearly $5 billion in net revenues that were saved by the reduction in compensation payments from 50% to 38% of net revenues, and that causation may be inferred both from the chronology of events (Goldman’s January 21 announcement followed the filing of and a flurry of activity in the actions), and by what plaintiffs refer to as Goldman’s “radical departure” from its prior policy vis-a-vis compensation. (See plaintiffs’ mem in support at 35-36.) Plaintiffs thus contend that, unless defendants can show that their decision to reduce the level of compensation for 2009 was NOT caused by the filing of the actions, plaintiffs have demonstrated their entitlement to a fee award.
Defendants, however, argue that New York imposes a more rigorous test for determining whether to award attorneys’ fees. *462 By their analysis, a plaintiff seeking attorneys’ fees for prosecuting a lawsuit which has been mooted by a corrective action taken by the defendant must show not only substantial benefit and causation, but also that “the lawsuit at the outset asserted legally sufficient claims capable of surviving a motion to dismiss.” (Defendants’ mem in opposition at 14.)[9] Defendants contend that the complaints filed by plaintiffs do not meet this requirement because they failed to adequately plead that presuit demand was excused. Thus, defendants argue, before even reaching the questions of substantial benefit, causation and burden of proof, I must, first, determine whether the complaint was meritorious when filed.[10]
As set forth above, the Business Corporation Law itself contains no express language requiring a plaintiff to demonstrate the merits of its complaint in order to collect an award of attorneys’ fees. And, plaintiffs contend, the New York courts that have applied this statute likewise have not imposed such a requirement.
Indeed, the cases relied upon by plaintiffs address only substantial benefit and causation. In Seinfeld v Robinson (246 AD2d 291 [1998]), for example, the First Department reversed an order denying a motion for attorneys’ fees under Business Corporation Law § 626 (e), concluding that the benefit conferred upon the corporation by virtue of the shareholder derivative action was sufficiently substantial as to warrant the award. Since the lower court had denied the motion because it found that the corporation received only a minimal benefit from settlement of the action, the Seinfeld Court limited its discussion to an analysis of what constitutes a “substantial” benefit. The question of the lawsuit’s merits at the outset did not need to be, and was not, reached.* [11]
*463 Similarly, in Gusinsky v Bailey, a case involving a Delaware corporation, the trial court approved the settlement of a shareholder’s derivative action, pursuant to Business Corporation Law § 626 (d), but declined to award attorneys’ fees under Business Corporation Law § 626 (e), concluding that there were, “insufficient benefits obtained for the corporation or its shareholders to warrant an award of attorneys fees.” (21 Misc 3d 1107[A], 2008 NY Slip Op 52004[U], *4 [Sup Ct, NY County 2008, Cahn, J.], revd in part 66 AD3d 614 [1st Dept 2009].) On appeal, the Appellate Division reversed on the grounds that the benefit was, indeed, substantial enough as to warrant an award of attorneys’ fees. Neither the trial court nor the Appellate Division discussed the merits of the complaint. It thus appears that the question of whether such analysis is required on a fee application pursuant to Business Corporation Law § 626 (e) is an open issue in the First Department.[12]
Defendants argue that a proper reading of the Business Corporation Law makes clear that attorneys’ fees cannot be available under section 626 (e) unless the complaint satisfies the pleading requirements of section 626 (c).[13] This is a compelling argument. Section 626, as stated above, describes the *464 requirements for bringing a shareholder derivative action. Subdivisions (a) and (b) provide that the party who has standing to bring the action is one who is, at the time of bringing the action and at the time of the challenged transaction, a holder of shares or voting trust certificates, or of a beneficial interest in the corporation; and subdivision (c) provides that the complaint must set forth “with particularity” whether the pre-suit demand was made, or the reasons it was not. It simply cannot be that a party who does not meet the standing requirement of (a) and (b) could be eligible to collect fees under (e); likewise, it cannot be that a party who fails to meet the pleading requirements of (c) would be eligible for a fee award pursuant to (e).
Thus, even if New York courts have, as yet, not required application of Delaware’s “meritorious when filed”[14] standard when addressing a fee claim under subdivision (e), there can be no doubt that any party seeking an award of attorneys’ fees under the auspices of section 626 (e) must comply with the other provisions contained within the statute. Since subdivision (c) provides that the complaint must set forth, “with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort,” the party seeking relief under subdivision (e) must demonstrate that its complaint contains sufficiently particularized allegations of pre-suit demand or demand futility as to satisfy subdivision (c). In other words, the complaint must contain more than just conclusory allegations setting forth the basis of the claim that the business judgment rule ought not to apply. Any other rule would permit, even encourage, the filing of baseless claims, the sole objective of which is to collect an award of attorneys’ fees. I therefore examine the pleadings contained in the *465 complaint, not for the purpose of ascertaining the merits of each cause of action, but rather, to ensure that the standing and pleading requirements of section 626 (a)-(c) have been met.
Since there is no dispute that the plaintiffs here are shareholders of Goldman, and that they held their shares both at the time of the challenged transaction and at the time that this action was filed, I turn, next, to the question of whether the complaint sets forth, with particularity, the reasons for plaintiffs’ failure to make a pre-suit demand.
“One of the abiding principles of the law of corporations is that the issue of corporate governance, including the threshold demand issue, is governed by the law of the State in which the corporation is chartered.” (Hart v General Motors Corp., 129 AD2d 179,182 [1st Dept 1987].) Goldman is a Delaware corporation, and it is thus to Delaware that I turn to ascertain whether plaintiffs have adequately pleaded that the pre-suit demand was excused.
Like Business Corporation Law § 626 (c), rule 23.1 of the Delaware Chancery Court Rules provides that the complaint in a shareholder derivative action shall allege, “with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiffs failure to obtain the action or for not making the effort.” (Del Ch Ct Rules, rule 23.1 [a].) To satisfy rule 23.1, the pleadings must set forth more than conclusory statements; rather, the pleader must set forth “particularized factual statements that are essential to the claim.” (Brehm v Eisner, 746 A2d 244, 254 [Del 2000].)
The pre-suit demand is required because, generally, it is the corporation’s board of directors that has the “sole authority to initiate or refrain from initiating legal actions asserting rights held by the corporation.” (White v Panic, 783 A2d 543, 550 [Del 2001].) Rule 23.1, however, limits this authority by permitting shareholders to initiate a derivative suit “without the board’s approval where they can show either that the board wrongfully refused the plaintiffs pre-suit demand to initiate the suit or, if no demand was made, that such a demand would be a futile gesture and is therefore excused.” (783 A2d at 550.)
“[I]n determining demand futility the [court] in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged trans *466 action was otherwise the product of a valid exercise of business judgment.” (Aronson v Lewis, 473 A2d 805, 814 [Del 1984], overruled on other grounds by Brehm, 746 A2d at 253-254.)
The two prongs of the Aronson test “are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.” (Brehm, 746 A2d at 256.) Since rule 23.1 requires a plaintiff to set forth, in the pleadings, its reasons for failing to make a presuit demand, I limit the scope of my inquiry to the allegations contained in the complaint.
The gravamen of plaintiffs’ complaint is that Goldman’s Board breached its fiduciary duties to the company and to its shareholders by adhering blindly, over several years, and especially in 2009, to an established policy of paying out around 50% of net revenues as employee compensation. According to plaintiffs, the Board’s intended decision, in 2009, to make bonus payments at this rate did not take into account the fact that Goldman’s revenues for that year were not due to the performance of Goldman’s employees, but rather, to “accounting trickery” and governmental intervention. (See complaint If 90.) Plaintiffs allege that they did not make the requisite pre-suit demand because the wrongdoing set forth in the complaint, specifically, the intended approval of the 50% compensation-to-net revenue payments, was not the result of a valid exercise of business judgment, and, further, because the Board is beholden to Goldman and therefore not a disinterested, independent board capable of exercising appropriate business judgment. (See id. 1Í 99.)
I turn to the second prong of Aronson, first. Although plaintiffs argue that transactions amounting to waste of corporate assets are, as a matter of law, outside of the protection of the business judgment rule, and therefore excuse demand under this test, the complaint does not allege a cognizable claim of waste. The allegations to which plaintiffs point to support their purported waste claim are that Goldman’s revenues, net earnings, earnings per share and stock price all declined in 2008, but Goldman nevertheless paid $10.9 billion in employee compensation that year; and that the only reason that Goldman “survived 2008” was because of the “extraordinary federal government intervention and assistance,” which enabled it to recover its 2008 losses. (Complaint 1f1f 51-52, 57-86.) Plaintiffs contend, in their reply memorandum, that these allegations amount to a waste claim because the Board’s decision to *467 compensate Goldman employees, in 2009, with 50% of its net revenues, even though such compensation was not tied to the actual performance or consideration received from employees, was a decision on compensation that was “so disproportionately large as to be unconscionable and constitute waste.” (Reply mem at 8, quoting Brehm v Eisner, 746 A2d 244, 262 n 56 [Del 2000].)
However, a claim of waste requires particularized allegations that the consideration received by the corporation for a specific exchange is “so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.” (Brehm, 746 A2d at 263.) If there is “any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky.” (Id.)
Plaintiffs’ conclusory allegations as to the factors contributing to Goldman’s bottom line in 2009 are not sufficient to raise substantial doubt as to the good faith judgment of the Board in reaching its decision, nor are they sufficient to support the contention that the consideration received by Goldman, to wit: the past and future performance of its employees, was so disproportionately small that no reasonable person would accept it. Plaintiffs’ purported waste claim, then, does not satisfy the second prong of Aronson.
Plaintiffs next argue that demand is excused because the Board’s decision on compensation was so excessive as to amount to a breach of the fiduciary duty of loyalty. Plaintiffs argue that the Board’s decision was based merely on blind adherence to an already established policy, and therefore constitutes an “intentional dereliction of duty, [or] a conscious disregard for one’s responsibilities.” (Reply mem at 9-10, quoting In re Walt Disney Co. Derivative Litig., 906 A2d 27, 63 [Del 2006].) Plaintiffs assert that under Delaware law, this is “bad faith” conduct, which results in a breach of the fiduciary duty of loyalty. (See reply mem at 10.) In Delaware, this category of “bad faith” conduct, which includes those actions taken by a fiduciary “with a purpose other than that of advancing the best interests of the corporation,” falls between that conduct which is motivated solely by subjective bad intent, and that conduct resulting from gross negligence, and is treated as a “non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith.” *468 (See Walt Disney, 906 A2d at 67, 66, citing In re Walt Disney Co. Derivative Litig., 907 A2d 693 [Del Ch 2005].)
Thus, in order to plead a breach of the fiduciary duty of loyalty based on this bad faith conduct, plaintiffs must allege particularized facts, and not merely conclusory statements, that would “rais[e] a reason to doubt whether the board’s action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation.” (In re Walt Disney Co. Derivative Litig., 825 A2d 275, 286 [Del Ch 2003].)
There is no contention that the Board was not adequately informed in making its decision on compensation, and so the question is whether the pleadings provide a sufficient basis to doubt that the decision was taken in the honest belief that it was for the good of the corporation.
The allegations to which plaintiffs point for support for the claim that the Board acted in bad faith under this standard, are, first, the conclusory allegation that when Goldman went public in 1999, the “Board adopted a policy of paying approximately 50% of net revenues as compensation for employees every year.” (Complaint 11 39.) This policy represented an extension of Goldman’s practice, as a private partnership, of paying out between 40% and 50% of revenues as compensation. (Id. 1i 38.) Plaintiffs further allege that, although Goldman has issued several assurances to stockholders that it determines compensation levels on the basis of performance, the consistency of the compensation-to-net revenues ratio, regardless of the price of Goldman stock, belies these assurances. (Id. 1111 42-53.)
Plaintiffs allege that the Board’s decision, in 2009, to compensate its employees at the 50% rate, provides evidence of the Board’s blind adherence to this policy because Goldman’s 2009 revenues did not result from the performance of Goldman’s employees. Rather, they were the result of the infusion of taxpayer dollars into Goldman, directly, through the federal government’s Troubled Asset Relief Program, and, indirectly, through the bailout of insurance giant AIG, which enabled AIG to satisfy nearly $13 billion in Goldman debt obligations. (See complaint lili 55-67.) Plaintiffs contend that the Board’s failure to take these facts into account when making its decision on 2009 compensation raises doubt as to whether the Board’s decision was truly taken in the best interests of the corporation.
Although plaintiffs have clearly set forth the reasons for their disagreement with — even outrage over — the Board’s decisions *469 on compensation over the years, the allegations contained in the complaint do not provide any basis for the conclusion that the Board acted for any purpose other than the advancement of the company’s interests. Moreover, the complaint does not offer any particularized allegations as to how, in this specific instance, and with regard to this specific decision, the Board abdicated its responsibilities.[15] Such conclusory allegations as to bad faith are not sufficient to satisfy rule 23.1 or the second prong of Aron-son.
Turning to the first prong of the Aronson test, “the court reviews the factual allegations to decide whether they raise a reasonable doubt . . . that the protections of the business judgment rule are available to the board.” (Aronson, 473 A2d at 814.) In the event that the pleadings set forth particularized allegations that raise a doubt as to the independence or disinterestedness of a majority of the directors, then the business judgment rule does not protect the Board, and demand futility has been established. {See id. at 814-815.)
Directors are disinterested when they “neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.” {Id. at 812.) However, “in the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he received any benefit. . . Such benefit must be alleged to be material to that director.” (Orman v *470 Cullman, 794 A2d 5, 23 [Del Ch 2002].) In this context, materiality means that the benefit was so substantial, “in the context of the director’s economic circumstances, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest.” (Id., quoting In re General Motors Class H Shareholders Litig., 734 A2d 611, 617 [Del Ch 1999] [emphasis added by the Orman court].)
Similarly, independence “means that a director’s decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.” (Aronson, 473 A2d at 816.) A director’s independence is called into question when a plaintiff pleads particularized facts that establish “a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.” (Orman, 794 A2d at 24 [internal quotation marks omitted].) The lack of independence is demonstrated “when a plaintiff pleads facts that establish that the directors are beholden to [the controlling person] or so under their influence that their discretion would be sterilized.” {Id. [internal quotation marks and citations omitted].)
Defendants do not dispute that defendants Blankfein and Cohn, as employees, may be considered interested under the standard set forth above. Plaintiffs must therefore raise a reasonable doubt as to the independence or disinterestedness of at least 5 of the other 10 directors. They assert three bases for their contention that a majority of the Board is not disinterested or independent, and the business judgment rule thus does not protect the decision on compensation.
First, plaintiffs argue that defendants Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juliber, Mittal, Schiro and Simmons (collectively, the director defendants) are not disinterested because they face a substantial likelihood of liability for waste and breach of fiduciary duty due to their “blind adherence” to the alleged policy on compensation. However, “the mere threat of personal liability ... is insufficient to challenge either the independence or disinterestedness of directors [unless a plaintiff pleads particularized facts showing] that a majority of directors [face] a substantial [threat] of personal liability.” (Wood v Baum, 953 A2d 136, 141 n 11 [Del 2008] [internal quotation marks and citations omitted; emphasis added].)
I have already determined that the allegations contained in the complaint do not set forth a basis to conclude that demand *471 is excused on the basis of waste or breach of fiduciary duty, and so I cannot conclude that this decision is “so egregious on its face that board approval cannot meet the test of business judgment, and [that] a substantial likelihood of director liability therefore exists.” (Aronson, 473 A2d at 815.) Plaintiffs’ first argument as to directorial disinterestedness therefore fails.
Next, plaintiffs argue that each of the director defendants is beholden to Goldman, Cohn and Blankfein because each “is paid a significant yearly stipend, creating a financial incentive for these directors to retain their positions as directors, thereby shattering any claims of independence.” (Complaint 1Í 107.) Plaintiffs allege that each of the director defendants received close to $700,000 in total compensation for 2007, and more than $300,000 in total compensation for 2008, and assert that “[Compensation of this level is certainly material to Defendants.” (Id. 1Í1Í107-108.)
For plaintiffs to demonstrate that the receipt of compensation in the form of directors’ fees is sufficient to raise a reasonable doubt as to the independence of the director defendants, they must do more than allege, simply, that the fees were received. (See e.g. Grobow v Perot, 539 A2d 180, 188 [Del 1988], overruled on other grounds by Brehm v Eisner, 746 A2d 244 [Del 2000] [concluding that allegations that directors are paid for their services, “without more, do not establish any financial interest” sufficient to call into question director independence].) If, for example, the fees are “shown to exceed materially what is commonly understood and accepted to be a usual and customary director’s fee,” the presumption of directorial independence may, indeed, be rebutted. (In re National Auto Credit, Inc. Shareholders Litig., 2003 WL 139768, *11, 2003 Del Ch LEXIS 5, *39 [2003], quoting Orman, 794 A2d at 29 n 62.)
Here, the complaint is devoid of any allegation that the fees received by the director defendants, as generous as they appear to be, were anything other than usual and customary. Notwithstanding plaintiffs’ contention that compensation of several hundred thousand dollars per year is “certainly material” to the director defendants, and that the financial incentive to remain on the Board “shatters” their ability to consider a presuit demand, there is nothing contained in the complaint to support that conclusion. (See e.g. Orman, 794 A2d at 23 n 44 [“including an allegation that a benefit is ‘material’ to the director in question, without more, would merely be a conclusory allegation and insufficient to raise a reasonable doubt of interest” or independence].)
*472 Plaintiffs make only one specific allegation as to the materiality of this level of compensation, and that is with regard to Director Defendant Simmons. Plaintiffs allege that, since Simmons earned “$536,000 in 2009 as President of Brown University . . . the large amount of compensation she received from Goldman creates an especially compelling financial incentive for her to retain her position as director and she is therefore beholden to Goldman and its executives.” (Complaint 1i 108.) This assumption, however, does not consider the possibility that Simmons may have other sources of income, and that her Goldman fee may only comprise a small percentage of her total annual compensation, and may therefore not, “in the context of [her] economic circumstances,” be so significant as to prevent her from performing her fiduciary duties without being influenced by her own financial interests. (See Orman, 794 A2d at 23.) I therefore cannot infer that the compensation Simmons receives from Goldman is sufficient, on its own, to raise a doubt as to her disinterestedness.[16]
Since plaintiffs make no further, specific allegations as to the materiality of the fees received by the other director defendants, the complaint does not provide a basis from which to infer that the receipt of the fees, or the director defendants’ desire to continue receiving them, would affect their ability to impartially consider a demand. Plaintiffs have therefore not raised a reasonable doubt as to the disinterestedness or independence of a majority of the Board based on the receipt of directors’ fees.
Finally, plaintiffs argue that the director defendants are not independent because certain of the directors are also affiliated with, or hold stock in, companies that do business with Goldman. Plaintiffs contend that these director defendants are beholden to Goldman because “Goldman’s employees and executives have the power to harm [their] financial interests.” (Reply mem at 15.) Plaintiffs allege that defendant Dahlback, an advisor to, and former member of the board of, Investor AB, was awarded over one million options to purchase Investor AB stock from 1978 to 1999. (Complaint It 110.) Plaintiffs also allege that Dahlback serves on the investment committees of certain funds managed by a private equity firm, and that Goldman subsidiar *473 ies have invested into some of these funds. (Id. If 112.) Since Goldman issues buy, sell and hold recommendations on Investor AB stock, and since Goldman dollars have been invested into some of the funds Dahlback manages, plaintiffs allege that he is “beholden to Goldman and its executives because they have the power to significantly reduce the value of his Investor AB stock” and to negatively impact some of the funds he manages. (Id. lili 111-112.)
In a similar vein, plaintiffs allege that defendant George, who owns more than three million shares of Medtronic, a company with which Goldman has a “longstanding business relationship” (id. 1f1f 113-114), and defendant Gupta, a senior partner emeritus with McKinsey & Company, to which Goldman gives “significant business” (id. 11 115) are beholden to Goldman. Plaintiffs argue that these director defendants could not impartially consider a pre-suit demand because of the possibility that Goldman could, as a company, decide either to withhold certain investment funds, or to issue a negative recommendation on certain stock. However, this contention is entirely speculative and not supported by a single, specific allegation that could establish “a direction of corporate conduct,” by any of these director defendants, “in such a way as to comport with the wishes” of the controlling entities. (See Orman, 794 A2d at 24.) Plaintiffs have therefore failed to raise a doubt as to the independence of Dahlback, George, or Gupta.
The allegations as to the remaining director defendants fare no better. The sole allegation as to defendant, Friedman, is that he has a long-standing relationship with Goldman. (Id. 1Í116.) Plaintiffs cite no case to support the argument that this, alone gives rise to a reason to doubt his independence, and I find no basis for such an inference.[17]
*474 With regard to defendant, Johnson, plaintiffs allege that Goldman provided certain assistance to Fannie Mae, an entity that Johnson worked with in various capacities over several years. (Complaint 1Í1Í117-122.) Although plaintiffs allege that Johnson is beholden to Goldman on the basis of this past relationship, this allegation is purely speculative and wholly conclusory, and therefore insufficient to raise a doubt as to his independence. (See e.g. Jacobs v Yang, 2004 WL 1728521, *6, 2004 Del Ch LEXIS 117, *22 [Del Ch 2004, No. Civ A 206-N] [conclusory allegations as to certain business relationships do not satisfy pleading requirements of rule 23.1, and do not give risé to a reason to doubt director independence].)
Similarly, the allegation that defendant Mittal, is beholden to Goldman because of Goldman’s substantial loans to (through participation in a credit facility with) ArcelorMittal, a company in which Mittal owns more than 600 million shares, does not contain anything more than a speculative statement as to Goldman’s ability to influence the price of ArcelorMittal stock, and the conclusoiy assertion that the close relationship between the two companies calls into doubt the independence of Mittal. (See complaint 1111123-124.)
Likewise, the only allegations as to defendant Schiro are that he is a former CEO of both Zurich Financial Services and PricewaterhouseCoopers, two companies with which Goldman has a close relationship, and that Schiro is thus beholden to Goldman because Goldman has “the power to influence the price of his holdings in Zurich Financial Services and negatively impact his close relationship with PricewaterhouseCoopers.” (Id. Iflf 124-129.)
As stated above, these speculative and conclusory allegations do not establish that any of these director defendants directed their corporate conduct in such a way as to comport with the wishes or interests of Goldman executives. (See Orman, 794 A2d at 24; see also Khanna v McMinn, 2006 WL 1388744, *17, 2006 Del Ch LEXIS 86, *66 [Del Ch, 2006, No. Civ A 20545-NC] [conclusory allegations as to director’s business relationships are not sufficient to demonstrate that the director’s “independent discretion would be compromised”]; see also id. 2006 WL 1388744, *20, 2004 Del Ch LEXIS, *79 [“the sweeping absence of particularity, here, precludes a reasonable inference that (a *475 director’s) business dealings or relationships compromised his presumed independence”].)
Plaintiffs, therefore, have not established that the director defendants are beholden to any particular corporate influence, and they have not satisfied the first prong of Aronson. Having failed to satisfy either the first or second prong of the well established Aronson test, plaintiffs have not satisfied the pleading requirements of rule 23.1 (a) of the Delaware Chancery Court.[18] Therefore, I cannot conclude that the complaint has “set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making the effort,” as required by Business Corporation Law § 626 (c). Since I have determined that the fee award provision of section 626 (e) is not available to a plaintiff who has not satisfied the pleading requirements of section 626 (c), there is no need for me to address the questions of substantial benefit and causation, and plaintiffs’ motion for an award of attorneys’ fees is denied.
In light of the conclusion that plaintiffs have not demonstrated their entitlement to a fee award, the motion of individual plaintiff Ken Brown, for an incentive fee award, is also denied.
Finally, since defendants do not oppose that portion of plaintiffs’ motion seeking to dismiss this consolidated action, that much of plaintiffs’ motion is granted.
Accordingly, it is ordered that plaintiffs’ motion to dismiss and for an award of attorneys’ fees and reimbursement of litigation expenses (motion sequence No. 002) is granted insofar as it seeks dismissal of this consolidated action, and it is denied in all other respects; and it is further ordered that this consolidated action is dismissed, with prejudice; and it is further ordered that the motion of individual plaintiff Ken Brown for an incentive fee award (motion sequence No. 003) is denied; and it is further ordered that the confidential materials submitted in connection with these motions will be left with the Part Clerk; if the parties do not pick them up within 10 days of the date of this order, they will be destroyed.

. Security Police & Fire Professionals of Am. Retirement Fund et al., v Lloyd C. Blankfein et al., index No. 650740/2009 (the Security Police action).

. Ken Brown v Lloyd C. Blankfein et al., index No. 650003/2010 (the Brown action).

. Central Laborers’ Pension Fund v Lloyd C. Blankfein et al., index No. 600036/2010 (the Central Laborers’ action).

. By order dated March 9, 2010, I consolidated these three actions under the index number of the Central Laborers’ action (the consolidated action). References to “plaintiffs” thus include the plaintiffs in the Security Police, Brown and Central Laborers’ actions.
Moreover, in this motion, plaintiffs refer and cite only to the complaint filed in connection with the Central Laborers’ action, since the complaints filed in connection with the Security Police and Brown actions contain the same or substantially similar allegations. (See mem of law in support of plaintiffs’ motion to dismiss and for an award of attorneys’ fees and reimbursement of litigation expenses at 21 n 51.) Therefore, unless otherwise noted, references to the “Complaint” will refer to that filed in connection with the Central Laborers’ action.

. Subsequent letters from defendants, dated January 13 and 14, 2010, and from plaintiffs, also dated January 13 and 14, addressed certain objections to plaintiffs’ order to show cause, and discussed some of the parties’ substantive grounds for and objections to the intended motion to dismiss. By order dated January 15, 2010, I instructed the defendants to raise their arguments in their opposition papers, and set the requested premotion conference for January 25, 2010, the previously scheduled time for oral argument on plaintiffs’ motion for an injunction and expedited discovery.

. Affidavit of Michael J. Barry in support of plaintiffs’ motion to dismiss and for an award of attorneys’ fees and reimbursement of litigation expenses.

. Plaintiffs’ memorandum of law in response to defendants’ cross motion for a protective order and to stay discovery.

. Memorandum of law in support of plaintiffs’ motion to dismiss and for an award of attorneys’ fees and reimbursement of litigation expenses.

. Defendants’ memorandum in opposition to plaintiffs’ motion for attorneys’ fees.

. Defendants also contend that plaintiffs have conceded this point by citing, in an earlier filing before the court, to In re First Interstate Bancorp Consol. Shareholder Litig. (756 A2d 353 [Del Ch 1999]) as support for its right to seek a fee award. (See plaintiffs’ mem in opposition to cross motion, Jan. 25, 2010, at 1 n 1.) I do not agree that this citation amounts to a concession.

. I note, however, that the lower court did not completely avoid the question of merit. The trial court’s decision includes a brief comment on the plaintiffs’ failure to have “prevailed in this action,” as well as reference to the statement in the stipulation of settlement that the defendant’s motion to dismiss “was likely to be granted.” (Seinfeld v Robinson, 172 Misc 2d 159, 164, 165 [Sup Ct, NY County 1997, Crane, J.], read 246 AD2d 291 [1998].) *463 However, it is clear that the lower court’s denial of the motion turned on the question of substantial benefit, as did the decision of the First Department.

. Plaintiffs also cite to Matter of Cablevision Sys. Corp. Shareholders Litig. (21 Misc 3d 419 [Sup Ct, Nassau County 2008]). The fee application in that case was not brought under the Business Corporation Law, but the court discussed the propriety of awarding attorneys’ fees where a shareholders’ action has resulted in a benefit, “even where there had been a settlement and adjudication on the merits had not been reached.” (21 Misc 3d 419, 433 [2008].) The issue in Cablevision was, as in Seinfeld, whether or not the purported benefit achieved by the litigation was, in fact, any benefit at all. The Cablevision court did not inquire as to the merits of the lawsuit, but rather, only asked whether there had been a substantial benefit, and whether plaintiffs had established “that their suit was a proximáte cause of the benefit obtained.” (Id.)
Similarly, in Koppel v Wien (743 F2d 129 [2d Cir 1984]), which is also relied upon by plaintiffs, and which also did not involve a claim for attorneys’ fees under the Business Corporation Law, the Second Circuit Court of Appeals reversed the trial court’s denial of an award of attorneys’ fees. The Southern District Court had denied the fee application because no clear benefit had been shown, and the Second Circuit reversed because it concluded that a benefit had, indeed, been conferred on the participants in a real estate venture. (Id. at 133-134.)

. Defendants cite to several cases to support their contention that I must examine the merits of the complaint on an application for attorneys’ fees under Business Corporation Law § 626 (e). However, most of those cases apply Delaware law, and it is clear that the Delaware courts require a demonstration *464 that the complaint is “meritorious when filed” in order to establish entitlement to attorneys’ fees. (See Chrysler Corp. v Dann, 43 Del Ch 252, 223 A2d 384 [1966].) The one exception is Mokhiber v Cohn (608 F Supp 616 [SD NY 1985]), in which the Southern District Court, construing New York law, looked to the courts of Delaware “for guidance” and concluded “that a New York court would disallow any claim by the defendant lawyers for lack of standing to assert it.” (Id, at 626, 626-627.) I agree.

. “A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.” (Chrysler, 43 Del Ch at 256-257, 223 A2d at 387.)

. To the contrary, the complaint also contains a chart, showing net revenues and compensation in dollar amounts, as well as compensation as percentage of net revenue, from 1999 through 2008. (Complaint 1J 39.) This chart, itself, shows that the compensation level varied from 44% to 49% of net revenues over that period, and thus gives rise to the inference that there was some calculation undertaken by the Board in reaching its decision on compensation. If the Board were truly adhering blindly to a policy of paying out a certain percentage, it seems that there would be even less variance in the percentage from year to year.
Similarly, the complaint also contains allegations that Goldman met, in 2009, with certain large shareholders who had expressed opposition to the size of the intended bonus pool. (Complaint 11 94.) Although plaintiffs speculate that the reason for these meetings was not to encourage shareholder feedback, but rather, to gain fodder for the Board’s efforts to avoid compensation reform, the very existence of these meetings suggests that the Board took external factors — including the perspective of shareholders — into account while making its decision on 2009 compensation. (See id. 1IH 92-95.) The allegation that the Board solicited shareholder feedback, irrespective of plaintiffs’ conclusory claim that it may have been done with an ulterior motive, rebuts any inference that the Board did not act in the best interest of the company.

. I recognize that this may be a close issue, and so I note that, even if I were to conclude that plaintiffs successfully called into question the disinterestedness of Simmons, they would still be required to raise doubts as to the independence or disinterestedness of at least four of the other director defendants. This, as will be shown below, plaintiffs have failed to do.

. Plaintiffs cite to In re Morgan Stanley & Co., Inc. (2009 WL 2195928, 2009 US Dist LEXIS 65166 [SD NY July 22, 2009], No. 08 Civ 7587 [AKH]), for the proposition that friendships or associations with inside directors affect independence. However, the Morgan Stanley court actually rejected the allegation that a friendship or association with inside directors would affect independence. (See id., 2009 WL 2195928, **1, 2009 US Dist LEXIS 65166, *4-5 [“I reject plaintiffs’ allegations that independence is corrupted by . . . friendships or associations with inside directors, Jacobs v. Yang, 2004 WL 1728521, at *5-6 (Del. Ch. Aug. 2, 2004) (requiring plaintiffs to allege that inside directors had the power to terminate the business relationship and that relationships were material to the other companies)”].) In any event, the complaint does not contain any allegation that Friedman, through his long career with Goldman, actually maintained any friendship or association with inside directors, *474 let alone that such inside directors had the power to terminate the business relationship.

. See supra at 465.